**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 1, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

CARLOS NAJERA-LUNA,

  Defendant - Appellant.

No. 07-1262

(D. Colorado)

(D.C. No. 06-CR-446-LTB)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

Defendant and appellant Carlos Najera-Luna pled guilty to one count of

fraud and misuse of permits and other documents, as well as aiding and abetting,

in violation of 18 U.S.C. §§1546(a) and 2, and one count of illegal reentry into

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

the United States following deportation, in violation of 8 U.S.C. § 1326(a).  He

was sentenced to thirty-three months' imprisonment on count one and twenty-four

months' imprisonment on count two, to be served concurrently.  Najera-Luna

appeals his sentence, which we affirm.


## BACKGROUND

The following undisputed facts are taken from the Plea Agreement and

Statement of Facts signed by Najera-Luna:

> Government agents with the Immigration and Customs
> Enforcement Service received information [that] "Alvarez" with a
> telephone number 720-620-2217 related to 645 Wolff Street,
> apartment 56, Denver, Colorado, was associated with the sale of
> counterfeit Identity documents.  On August 29, 2006, defendant
> EDUARDO MORALES-HERNANDEZ sold to an ICE cooperating
> informant a counterfeit alien registration card and a counterfeit social
> security card for $100.  On September 6, 2006, defendant
> MORALES-HERNANDEZ again sold to an ICE cooperating
> individual a counterfeit alien registration card and counterfeit social
> security card for $90.  At that time surveillance agents observed
> defendant CARLOS NAJERA-LUNA meet with defendant
> EDUARDO MORALES-HERNANDEZ at apartments located at 1590
> Wolff Street.  The Government's investigation determined that
> defendant NAJERA-LUNA under the name of Martinez-Garcia
> rented apartment 304 at the 1590 Wolff Street address.

> On September 26, 2006, a third scheduled purchase of
> counterfeit identity documents was arranged by ICE agents.
> Surveillance agents again observed defendants MORALES-
> HERNANDEZ and NAJERA-LUNA meeting at the location of 1590
> Wolff Street. On September 26, 2006, defendant MORALES-
> HERNANDEZ was arrested by ICE agents.  Several items relating to
> counterfeit documents were seized from MORALES-HERNANDEZ

to include "customer" photographs, order sheets containing biographic information and a polaroid camera.

A search warrant was then executed at apartment 304 of 1590 Wolff Street, Rhapsody apartments, Denver, Colorado. Defendant NAJERA-LUNA was present inside apartment 304 and claimed that his true name was Diego Martinez-Garcia. The search of apartment 304 produced a volume of evidence related to the production of counterfeit identity documents to include counterfeit laminates, counterfeit social security cards and completed counterfeit documents. A computer work station was located to include a Dell 2400 computer, a printer and a scanner. The Government agents concluded that defendant NAJERA-LUNA was in the process of making counterfeit identity documents at the time of the search warrant's initial execution. A forensic search of the computer seized from apartment 304 revealed an excess of 100 documents including capability to produce additional documents.

Plea Agreement and Statement of Facts Relevant to Sentencing at 5, R. Vol. I, doc. 42. Najera-Luna thereafter admitted that he had been deported previously to Mexico, and that "he had been manufacturing alien registration cards and social security cards for the past three months and that he had been working with MORALES-HERNANDEZ selling identity documents. [He] admitted that he bought the computer and the compact disk which contained electronic templates of counterfeit documents several months prior to his arrest." Id. at 6. The indictment to which Najera-Luna pled guilty covered the time period from August 29, 2006, until September 25, 2006.

In preparation for sentencing under the advisory Guidelines of the United States Sentencing Commission, Guidelines Manual ("USSG") (2006), the United States Probation Office prepared a presentence report ("PSR"). The PSR detailed

more items found on Najera-Luna's computer, including: 93 document templates; 837 photographs "commonly used to manufacture identity documents"; "three Social Security cards, two permanent resident cards, one Colorado Driver's license, 10 pages of lamina with government seal imprints, and a ledger and miscellaneous papers containing more than 100 entries of names, dates of birth, telephone numbers, addresses, and Social Security numbers." PSR at ¶¶ 12-14, R. Vol. III.

The PSR calculated that the base offense level for a violation of 18 U.S.C. § 1546(a) was eleven. Pursuant to USSG §2L2.1(b)(2)(C), the base offense level was increased by nine because the offense "involved 100 or more" documents or passports. After a three-level downward adjustment for acceptance of responsibility, Najera-Luna's total offense level was seventeen. With a criminal history category of III, Najera-Luna's advisory Guidelines sentencing range was thirty to thirty-seven months.

In recommending an appropriate sentence, the PSR discussed the statutory sentencing factors of 18 U.S.C. § 3553(a). Thus, the PSR detailed the nature, circumstances and seriousness of the offense, as well as the need for a sentence to promote respect for the law, promote just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. The PSR noted the following:

The defendant has two convictions, including one drug-related felony conviction. He has four active warrants. He was placed on probation in Adams County in August 2003 and never reported to the probation department. All four of the defendant's arrests involve his use of drugs or alcohol. He has been arrested three times for alcohol-related driving offenses. The defendant has a history of using aliases, fraudulent identification cards, and numerous dates of birth. At each arrest, the defendant has provided a different name to officers.

PSR at ¶ 102, R. Vol. III.

Najera-Luna objected to the advisory Guideline sentence, arguing that a nine-level increase in his base offense level on the ground that the offense involved 100 or more documents is incorrect, because the evidence only established that he possessed ten completed documents. The government opposed Najera-Luna's argument, asserting that it would present evidence at sentencing of the involvement of 100 or more documents.

At sentencing, the parties discussed at length whether the nine-level increase in the base offense level was appropriate based on the "involvement" of 100 or more documents. The government called as a witness ICE agent Jeff Lemeke, who specialized in targeting groups who manufactured false identity cards in the Denver area. Agent Lemeke testified that he had found at Najera-Luna's apartment "evidence that we typically find in counterfeit documents [investigations]; namely, computer, scanner, printer, laminating machines, and a volume of blank counterfeit laminates bearing forth government seals." Tr. of Sentencing at 7-8, R. Vol. II. He explained that "after the counterfeit document is

manufactured on the computer using a photograph and electronic templates, that

form is printed out and then subsequently laminated with the counterfeit laminates

bearing forged government seals." Id. at 9. Agent Lemeke further explained that

"electronic templates" are "contained electronically within the computer." Id.

When asked to describe a template, the agent stated:

> When I refer to template . . . it refers to the electronic form of the
> blank counterfeit document that's stored on the computer. Before
> counterfeit document vendors began using computers, when we
> would seize a computer or a counterfeit document lab, we would find
> blank stacks of hard copies of counterfeit documents. Now that
> they're using computers, all of those blank documents are simply
> electronically stored in a computer, and those are what I refer to as
> templates.

Id. at 10. Thus, a "template is basically an electronic format of a document minus

the photograph that's attached to the document and the biographic information

that gets put onto the document as it's being created." Id. The agent further

explained that, of the 93 document templates found on Najera-Luna's computer,

as detailed in the PSR, "there were some duplicates . . . [inasmuch as his

computer] had templates for driver's licenses from the country of Mexico,

driver's licenses from the United States, alien registration cards and Social

Security cards." Id. at 11-12. On cross-examination, the agent conceded that "the

vast majority of these 93 documents have a file created date predating the date of

offense in [the] [i]ndictment." Id. at 32.

With respect to the laminates found in Najera-Luna's apartment, Agent Lemeke testified that the laminates "come in the form of 8 x 11 sheets of plastic, and each sheet has the capability to produce eight counterfeit documents. And within that package of laminates there were well in excess of the number of laminates required to make a hundred documents in the future." Id. at 13. Lemeke testified further regarding the forensic analysis of the computer found in Najera-Luna's apartment. He stated it contained "over 800" "passport style head shots" of individuals. Id. at 15. The agent testified that there were approximately 150 head shots from the time covered by the indictment (i.e. August 29 to September 26 of 2006). He acknowledged, however, that, while he was unable to determine how many completed documents Najera-Luna had produced during the relevant time period, he

> can say that during the applicable time frame of the indictment, there is in excess if 100 customer photographs on his computer which, as I stated, indicates to me that those pictures represent viable customers for Mr. Najera-Luna, and that he was in the process of manufacturing documents for those customers. So my analysis of the computer, based on my knowledge and experience, tells me that a document was manufactured for each of those photographs on his computer, although I can't say which, or what kind of document was manufactured.

Id. at 19. Najera-Luna argued that the government had failed to prove that the documents were in fact counterfeit or false.

After observing that Najera-Luna pled guilty to 18 U.S.C. § 1546, which prohibits a person from "knowingly forg[ing], counterfeit[ing] . . . or falsely

mak[ing] any . . . document prescribed by statute or regulation for entry," the district court concluded:

> [T]he question distills . . . to what constitutes documents. What I have in the evidence is a combination in virtual form, or otherwise, of 93 templates and which contain various amounts of information, biographical information in excess of 100 laminates; the laminate containing forged government seal embossed on plastic; 150 photographs either in an immigration format or driver's license format, which when combined and completed would yield, together with at least the 12 documents admitted by the defense, would yield in excess of 100 completed documents; the process being to go to the template on the computer, scan in the photograph, add the photograph and biographical information to the template; print from that the document and laminate it with the seal; all of which was possessed by defendant during the relevant time period. The question then distills to this: With the capability to complete in excess of 100 documents from that which was in defendant's possession during the relevant time period, is this sufficient to constitute 100-plus documents within the meaning of the guideline.

Id. at 49-50. Relying upon the First Circuit's decision in United States v. Viera, 149 F.3d 7, 8 (1st Cir. 1998), in which the court held that "involved" for purposes of USSG §2L2.1(b)(2)(C) does not mean "produced," the district court concluded that "to be a document within the meaning of Guideline Sec. 2L2.1, the document need not be complete, but be at least capable of rendering complete." Tr. of Sentencing at 50-51, R. Vol. II. The court "therefore . . . conclude[d] that the government has met its burden by a preponderance of the evidence to establish that 100 or more documents were involved during the relevant time period." Id. at 51. The court then sentenced Najera-Luna to thirty-three months' imprisonment, followed by three years of supervised release. Najera-Luna

appeals, arguing the district court erred in (1) finding "that a digital or 'virtual image' is a 'document' for purposes of sentencing pursuant to USSG §2L2.1 and that a 'virtual document template' can be counted numerous times in determining how many documents were involved in the offense pursuant to USSG §2L2.1"; and (2) "finding that the prosecution proved by a preponderance of the evidence that the 100 or more documents Mr. Najera-Luna allegedly possessed were in fact counterfeit."  Appellant's Br. at 6.

## DISCUSSION

"In reviewing a criminal sentence, we first determine whether the district court correctly applied the Guidelines to arrive at the applicable sentencing range."  United States v. Chavez-Calderon, 494 F.3d 1266, 1268 (10th Cir. 2007). "In so doing, 'we review factual findings for clear error and legal determinations de novo.'"  Id. (quoting United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam)).  "When a defendant objects to a fact in a presentence report, the government must prove that fact at a sentencing hearing by a preponderance of the evidence."  United States v. Wilken, 498 F.3d 1160, 1169 (10th Cir. 2007) (further quotation omitted).  Thus, the government had to prove by a preponderance of the evidence that Najera-Luna's offense "involved" 100 or more documents.  The Guidelines provide no definition of "document" or "involves."

**I. Is a virtual image a document?**

Najera-Luna argues that a digital or "virtual" image is not a document for purposes of USSG §2L2.1, because, otherwise, a person with a single template of a document could always be charged with an offense "involving" 100 or more documents since that single template could be used over and over again to create many documents. This argument proves too much. The government did not attempt to prove the involvement of more than 100 documents by relying upon a single virtual image. Rather, it proffered, and the district court found, 93 templates, some of which were, not surprisingly, duplicates or virtually identical,[1] but many of which had varying amounts of information, sufficient laminates with forged governmental seals to make well over 100 documents, and 150 photographs formatted for driver's licenses or immigration documents. In other words, especially in view of the fact that Najera-Luna was in the process of making counterfeit documents when the search warrant was executed, the government presented evidence of a number of templates and other materials, in varying stages of completion, but sufficient to make more than 100 documents. We accordingly do not address, nor do we suggest any liability attaching to, the situation hypothesized by Najera-Luna where a defendant has a single virtual image or template on his computer.

---

[1]It is not surprising that the basic format or template for the same type of document is largely the same.

Furthermore, it does not matter that the government did not prove the existence of 100 or more completed forged documents. As the First Circuit found in Viera, "'involved' does not mean 'produced.'" Viera, 149 F.3d at 8. Rather, the First Circuit "reject[ed] the notion that the term 'involved' refers only to completed documents. Rather, applying a more ordinary definition, we read 'involved' as referring to items 'draw[n] in,' 'implicated' or 'entangled.'" Id. at 8-9 (quoting Webster's Third New International Dictionary 1993 at 1191); see also United States v. Castellanos, 165 F.3d 1129, 1132 (7th Cir. 1999) ("[T]he courts that have considered the question uniformly hold that the definition of 'identification document' includes uncompleted documents."); United States v. Salazar, 70 F.3d 351, 352 (5th Cir. 1995) ("Like the Ninth Circuit, we see no reason to distinguish between completed and uncompleted documents."); United States v. Martinez-Castillo, 6 F.3d 1400, 1403 (9th Cir. 1993) (counting as documents some which were blank and some which were completed). The government proved by a preponderance of the evidence that Najera-Luna's offense "involved" 100 or more documents.

**II. Proof that the documents were counterfeit:**

Najera-Luna argues that the district court erred in finding that "the vast majority of the 'documents' were in fact counterfeit." Appellant's Br. at 12. We reject this argument for two reasons. First, in his plea agreement, Najera-Luna admitted that the search of his apartment "produced a volume of evidence related

to the production of counterfeit identity documents [including] counterfeit laminates, counterfeit social security cards and completed counterfeit documents." Plea Agreement and Statement of Facts Relevant to Sentencing at 5, R. Vol. I, doc. 42. Further, he conceded that he was in the process of creating such counterfeit documents when the search warrant was executed. It is a bit far-fetched for Najera-Luna to now try to argue that all the documents were simply legal documents which had been scanned into his computer.

Second, as the evidence detailed by the district court indicates, there is no other logical conclusion to be drawn from the materials and evidence found on Najera-Luna's computer and at his apartment, but that he was engaged in producing counterfeit identity documents. And while not all the documents were in a complete and final form, that does not matter to the government's case against Najera-Luna.


## CONCLUSION

For the foregoing reasons, we AFFIRM the sentence.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge