*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0377p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

    *v.*

No. 11-1665

EDDIE CASTILLA-LUGO,

          *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:10-CR-168-3—Paul Lewis Maloney, Chief District Judge.

Argued: July 26, 2012

Decided and Filed: November 1, 2012

Before: BOGGS and McKEAGUE, Circuit Judges; and WATSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Madelaine C. Lane, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Hagen W. Frank, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Madelaine C. Lane, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Hagen W. Frank, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

    MICHAEL H. WATSON, District Judge. Mr. Castilla-Lugo appeals a sixty-three month sentence imposed for conspiracy to produce and traffic fraudulent identification documents and for possession of document-making implements. He

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

argues that the district court improperly applied the three-level managerial/supervisory role enhancement pursuant to § 3B1.1(b) of the United States Sentencing Guidelines ("U.S.S.G.") and improperly applied a nine-level enhancement under § 2L2.1(b)(2)(C), for the offense involving at least 100 documents. In addition, he argues his sentence is substantively unreasonable. We affirm the judgment of the district court.

## I.  FACTS

Mr. Castilla-Lugo lived in Mexico City with his wife and two children until 2001. Unable to support his family financially, in 2001 he moved to New York to look for employment. He lived in Queens until he was deported in November 2004.

Upon returning to Mexico City, Mr. Castilla-Lugo was again unable to support his family. In 2009, he returned to the United States and worked in an auto body shop in Wichita, Kansas until he was deported a second time later that year.

Undeterred, Mr. Castilla-Lugo entered the United States a third time. He again worked in Kansas until he was laid off, at which point he contacted Mr. Reyes-Gonzalez and made his way to Grand Rapids, Michigan, where Mr. Reyes-Gonzalez lived.

Mr. Reyes-Gonzalez made and sold false identification documents to illegal immigrants and had been doing so with Mr. Lopez-Sosa for more than a year and a half prior to Mr. Castilla-Lugo's arrival. Shortly after his arrival, Mr. Castilla-Lugo joined the operation and also began making and selling false documents. Mr. Reyes-Gonzalez rented an apartment in Grand Rapids; Mr. Castilla-Lugo lived in one of the bedrooms, and the documents were created in another. Mr. Castilla-Lugo then helped Mr. Reyes-Gonzalez move the business to another apartment, again with Mr. Castilla-Lugo living in one room and the documents being created in another. The "facility" (the room where the documents were created) was kept locked, and when Mr. Reyes-Gonzalez was home, no one had access to the room without Mr. Reyes-Gonzalez's permission.

At some point, three additional men arrived from Kansas and joined the conspiracy. These men, Mr. Armendariz-Becerra, Mr. Merlos-Gonzalez, and Mr. Alvarado-Ponce, knew Mr. Castilla-Lugo in Kansas. Mr. Reyes-Gonzalez let them live

in the apartment/production facility, gave them false documents for themselves, and provided them business cards and cell phones. Mr. Reyes-Gonzalez kept track of the number of each associate's sales in a notebook. He produced the fraudulent documents and sold them for $50 each to the other defendants, who in turn fixed their own price when selling to customers.

In 2009, Immigration and Customs Enforcement ("ICE")[1] began investigating a document production ring involving Mr. Reyes-Gonzalez. Through the use of surveillance and controlled buys, ICE obtained information about the organization. ICE agents also observed Mr. Reyes-Gonzelez and Mr. Lopez-Sosa selling documents. As Mr. Castilla-Lugo was not involved in the production ring at that time, ICE agents did not witness him making or selling documents during the course of their surveillance.[2]

ICE agents executed a search warrant on Mr. Reyes-Gonzalez's apartment on June 3, 2010. The agents found the six individuals identified above—Mr. Reyes-Gonzalez, Mr. Lopez-Sosa, Mr. Castilla-Lugo,[3] Mr. Armendariz-Becerra, Mr. Merlos-Gonzalez, and Mr. Alvarado-Ponce—in the apartment. ICE agents seized from the facility various materials related to the document production, including two Zebra Technologies card printers and several thumb drives containing electronic fraudulent-document templates. In Mr. Castilla-Lugo's bedroom, agents found a box of his own fraudulent business cards, a manual with instructions for changing the ribbon on the Zebra card printer, a CD for the Zebra card printer, and a fraudulent driver's license that was matched to a used Zebra printer ribbon.

## II. PROCEDURAL HISTORY

The Government filed a Superseding Indictment against Mr. Castilla-Lugo and others on July 29, 2010, charging Mr. Castilla-Lugo with: one count of conspiring to

[1] This particular section of ICE was renamed Homeland Security Investigations by the time of trial.

[2] In fact, ICE agents were not aware of Mr. Castilla-Lugo's involvement prior to the raid.

[3] Mr. Castilla-Lugo, Mr. Reyes-Gonzalez, and Mr. Lopez-Sosa were found hiding in the attic.

produce and traffic in fraudulent identification documents, in violation of 18 U.S.C. §§ 371 and 1028 ("Count One"); one count of knowingly possessing document-making implements with the intent they be used in the production of fraudulent identification documents, in violation of 18 U.S.C. § 1028 ("Count Two"); and one count of illegal reentry after previously being convicted of a felony, in violation of 8 U.S.C. § 1326 ("Count 10"). Mr. Reyes-Gonzalez, Mr. Lopez-Sosa, Mr. Armendariz-Becerra, and Mr. Merlos-Gonzalez[4] were named as co-conspirators in Count One and co-defendants in Count Two of the Superseding Indictment.

Mr. Castilla-Lugo pleaded guilty to the illegal reentry charge. Two of the co-conspirators, Mr. Reyes-Gonzalez and Mr. Lopez-Sosa, pleaded guilty to Count One. Mr. Castilla-Lugo and the other two co-conspirators were tried before a jury and convicted on Counts One and Two. Both Mr. Reyes-Gonzalez and Mr. Lopez-Sosa testified at the trial for the Government.

At sentencing, Mr. Castilla-Lugo objected to certain enhancements recommended in the Pre-Sentence Investigation Report, but the district court overruled those objections and applied a three-level enhancement for playing a managerial or supervisory role and a nine-level enhancement because the offense involved 100 or more documents. The district court also denied Mr. Castilla-Lugo's request for a downward variance and sentenced Mr. Castilla-Lugo to sixty-three months in prison, the top end of the sentencing guideline range. He now appeals.

## III. STANDARD OF REVIEW

"Sentences imposed post-*Booker* are reviewed for procedural and substantive reasonableness." *United States v. Haj-Hamed*, 549 F.3d 1020, 1023 (6th Cir. 2008) (quoting *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008) (citing *United States v. Booker*, 543 U.S. 220, 261 (2005))). "Regardless of whether the sentence imposed is inside or outside the Guidelines range, [this] court must review the sentence

---

[4]Mr. Alvarado-Ponce was deported prior to the filing of the Superseding Indictment and was not named therein.

under an abuse-of-discretion standard." *United States v. Vicol*, 514 F.3d 559, 561 (6th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). We must first ensure the district court did not commit a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Haj-Hamed*, 549 F.3d at 1023 (citing *Gall*, 552 U.S. at 51). If the district court failed to properly calculate the appropriate guideline range, we must remand for re-sentencing unless the error was harmless. *Vicol*, 514 F.3d at 561. If the sentence is procedurally sound, "we then review the sentence for substantive reasonableness under an abuse-of-discretion standard." *Haj-Hamed*, 549 F.3d at 1024 (citing *Gall*, 552 U.S. at 51).

## IV.  ANALYSIS

### A. Procedural Reasonableness

*1. Managerial Role Enhancement*

Mr. Castilla-Lugo first argues the district court improperly applied a three-level managerial role enhancement under U.S.S.G. § 3B1.1. He asserts the trial evidence showed, at most, that he was present for six weeks of the conspiracy, made ten documents, handed out business cards, and sold a couple of documents. He argues there was no evidence he managed employees, directed sales, supervised salesmen, took money, or even had authority over who to allow into the apartment.

The standard of review of a sentencing enhancement pursuant to U.S.S.G. § 3B1.1 is somewhat unsettled. Traditionally, "[a] district court's legal conclusions are . . . reviewed de novo, and its factual findings will not be set aside unless clearly erroneous." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007)). The Supreme Court held in *Buford v. United States*, however, that review under U.S.S.G. § 4B1.2 should be deferential rather than de novo, "in light of the fact-bound nature of the legal decision." 532 U.S. 59, 66 (2001). This court has thus far "found it unnecessary to determine

whether *Buford* requires us to alter the standard of review we apply in reviewing § 3B1.1 enhancements." *Moncivais*, 492 F.3d at 660 (citing *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005)); *see also United States v. Currier*, Nos. 11-5388, 11-5777, 2012 WL 1130427, at *3 (6th Cir. Apr. 4, 2012). Similarly, the uncertainty need not be resolved here because the application of the enhancement was proper under either standard of review.[5]

Under § 3B1.1(b), a three-level enhancement should be applied "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(b) (2011). The Sixth Circuit requires a showing that the defendant managed or supervised one or more participants in order to justify an enhancement under this provision, and management or supervision of the property, assets, or activities of the criminal organization may warrant an upward departure but not an enhancement. *United States v. Gort-DiDonato*, 109 F.3d 318, 320–21 (6th Cir. 1997). Courts consider the following factors to determine whether to apply an enhancement under § 3B1.1, and if so, whether the leader/organizer enhancement or the lesser manager/supervisor enhancement is appropriate:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, app. n.4 (2011); *see United States v. Jeross*, 521 F.3d 562, 579 (6th Cir. 2008). A district court need not find each factor in order to warrant an enhancement. *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006).

---

[5]"Regardless of the exact parameters of § 3B1.1(a) review in light of *Buford*, it is clear that factual findings made by the district court are reviewed for clear error." *United States v. Walls*, 546 F.3d 728, 735 (6th Cir. 2008) (citing *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005)). A factual finding "is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Currier*, 2012 WL 1130427, at *2.

Although the district court may have included factual and legal errors in its analysis, it did not commit reversible error in its ultimate decision to apply the three-level managerial enhancement to Mr. Castilla-Lugo. The district court made factual findings that Mr. Castilla-Lugo recruited three other individuals—Mr. Armendariz-Becerra, Mr. Merlos-Gonzalez, and Mr. Alvarado-Ponce—from Kansas to participate in the conspiracy. Additionally, it found Mr. Castilla-Lugo sent those men into the street to solicit customers, created false documents, moved the operation to a new apartment, was the primary resident of the apartment, and had access to the document-making implements. Most of these factual findings do not legally support a § 3B1.1 enhancement.

As noted above, the enhancement requires management or supervision of a *participant*, not the assets of the criminal enterprise. *Gort-DiDonato*, 109 F.3d at 321. Thus, while creation of documents, moving the operation between apartments, living in the apartment, and having access or control over the implementations could warrant an upward departure, they do not warrant an enhancement. *Id.*

Moreover, the district court clearly erred in finding that Mr. Castilla-Lugo sent Mr. Armendariz-Becerra and Mr. Merlos-Gonzalez into the street to solicit customers. Facts relied upon in sentencing must be found by a preponderance of the evidence. *See Gates*, 461 F.3d at 708. A review of the record shows there is no evidence to support this finding.[6] Thus, the district court committed clear error.

Nonetheless, other evidence supports the district court's finding that Mr. Castilla-Lugo recruited the three individuals from Kansas and brought them to the facility, which is legally sufficient to support the § 3B1.1(b) enhancement. Before being deported, Mr. Alvarado-Ponce stated in an interview that Mr. Castilla-Lugo invited him, Mr. Armendariz-Becerra, and Mr. Merlos-Gonzalez from Kansas to Michigan for the express

---

[6]There is record evidence that Mr. Castilla-Lugo was seen in a car with other co-defendants, that Mr. Castilla-Lugo's phone number was programmed into Mr. Merlos-Gonzalez's phone, and that Mr. Castilla-Lugo would pass out cards with both Mr. Armendariz-Becerra and Mr. Merlos-Gonzalez, but none of this evidence supports an inference that Mr. Castilla-Lugo sent those co-defendants into the streets or directed their activities.

purpose of selling counterfeit documents.[7] Further, although not specifically mentioned during sentencing by the district court, the evidence showed Mr. Castilla-Lugo allowed the men to use his car to travel from Kansas to Michigan and to continue using it throughout their involvement in the conspiracy and even created some of the false identification documents for them upon their arrival in Michigan. Therefore, the district court did not err in finding Mr. Castilla-Lugo recruited the three individuals from Kansas.

Even under a de novo review, this evidence would warrant a § 3B1.1(b) enhancement. Mr. Castilla-Lugo argues that he merely suggested the others participate in the crime, which, under comment 4 to this provision, does not make him a manager. Recruitment is distinguishable from suggesting criminal activity, however. In fact, the same comment specifically lists recruitment of accomplices and the degree of planning or organizing the offense within the seven factors courts should consider when determining whether to apply the lesser manager/supervisor enhancement or the greater organizer/leadership enhancement. U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, cmt. n.4 (2011).

It is evident that recruiting co-conspirators and planning and organizing their entrance into the conspiracy suffices to warrant the enhancement, even though the Government did not prove each of the other factors, such as receiving a larger share of the profits or exercising decision-making authority. *See Gates*, 461 F.3d at 709. In fact, Mr. Castilla-Lugo's actions are similar to other cases for which § 3B1.1 enhancements have been upheld by this court.[8] *See, e.g.*, *United States v. Plunk*, 415 F. App'x 650,

---

[7]Mr. Castilla-Lugo argues the record evidence is that Mr. Reyes-Gonzalez recruited these men. While Mr. Reyes-Gonzalez testified that he hired the men upon their arrival in Michigan, this does not contradict Mr. Alvarado-Ponce's statement that Mr. Castilla-Lugo recruited them, and that they came to Michigan at his invitation.

[8]This evidence would also likely warrant application of the enhancement in several of our sister circuits. *See United States v. Savarese*, Nos. 10-1726, 10-1842, 2012 WL 2821563, at *14 (1st Cir. July 11, 2012) ("the evidence clearly establishes that DeSimone was primarily responsible for recruiting co-defendant Richard Regnetta into the conspiracy. This conduct, by itself, constitutes a "managerial" function under § 3B1.1[(c)]."); *United States v. Clark-Thomas*, No. 11-14131, 2012 WL 1537840, at *2 (11th Cir. May 2, 2012) (finding recruitment supports enhancement under § 3B1.1(c)); *United States v. Young*, 334 F. App'x 477, 482 (3rd Cir. 2009) (manager enhancement proper where defendant recruited accomplice to travel from Florida to Pennsylvania and paid for accomplice's travel expenses, provided

653–54 (6th Cir. 2011) ("Under the caselaw of this Circuit, recruiting individuals to complete narcotics deliveries, even on a one time or temporary basis, constitutes supervisory conduct that warrants a § 3B1.1 enhancement."); *Gates*, 461 F.3d at 709 (enhancement proper where defendant recruited accomplices, drove them to the bank to cash forged checks, and shared in the profits); *United States v. Martinez*, 16 F. App'x 410, 415 (6th Cir. 2001) (upholding enhancement where district court found defendant had recruited a drug courier as part of conspiracy); *United States v. Kraig*, 99 F.3d 1361, 1370 (6th Cir. 1996) (managerial enhancement proper where defendant recruited accomplices and provided information regarding crime to those recruits); *see also United States v. Gibson*, 165 F. App'x 421, 422–23 (6th Cir. 2006) (recruitment plus exercise of authority and control over co-conspirator warranted four-level enhancement for leadership role).

Thus, the district court did not err under either standard of review when applying the three-level enhancement for a managerial or supervisory role.

*2. Specific Offense Characteristics Enhancement*

Mr. Castilla-Lugo also appeals the district court's application of the nine-level enhancement under § 2L2.1(b)(2)(C) for the offense involving 100 or more documents. Mr. Castilla-Lugo first argues that where a set of documents is intended for use by a single person, all such documents should be treated as a single document, and therefore, the Government did not prove the existence of 100 or more documents. Second, Mr. Castilla-Lugo argues he cannot be held responsible for the documents created before he joined the conspiracy.

As discussed above, we review the district court's factual findings for clear error and its application of the Guidelines provision to those facts de novo. *Vasquez*, 560 F.3d at 473 (citing *United States v. Moncivais*, 492 F.3d at 660). Although this court has not

---

drugs, and directed accomplice to parking lot where exchange took place); *United States. v. Erhart*, 415 F.3d 965, 973 (8th Cir. 2005) (mere recruitment sufficient for enhancement); *United States v. Jean*, 29 F. App'x 652, 654 (2nd Cir. 2002) (enhancement proper where defendant recruited others and received a cut of the proceeds); *United States v. Pippen*, 115 F.3d 422, 424–25 (7th Cir. 1997) (manager enhancement proper where defendant recruited at least one other individual and was the leader's right-hand man).

yet reviewed a district court's determination of the number of documents involved under § 2L2.1, it is a factual determination that will stand unless clearly erroneous. *See, e.g.*, *United States v. Murillo*, 284 F. App'x 982, 984 (3rd Cir. 2008); *United States v. Christ*, 513 F.3d 762, 775 (7th Cir. 2008); *United States v. Proshin*, 438 F.3d 235, 238 (2nd Cir. 2006); *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004); *United States v. Hiralal*, 44 F. App'x 176, 179 (9th Cir. 2002); *United States v. Ojeda-Cruz*, 29 F. App'x 152, 155 (4th Cir. 2002); *United States v. Tonoc-Chan*, 157 F.3d 901, No. 98-20016, 1998 WL 611511, at *1 (5th Cir. Aug. 18, 1998); *United States v. Viera*, 149 F.3d 7, 9 (1st Cir. 1998). A factual finding "is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Currier*, 2012 WL 1130427, at *2. The Government must have proved the number of documents by a preponderance of the evidence. *See Gates*, 461 F.3d at 708.

First, Mr. Castilla-Lugo argues that under § 2L2.1(b)(2), every document prepared for an individual client constitutes a single document. In essence, he argues that the Government would have to prove more than 100 individual clients in order for the enhancement to apply. Because the Government could not prove how many of the digital document templates were created for a single client, it could not prove 100 documents were created.

Application note 2 states, "[w]here it is established that multiple documents are part of a set of documents intended for use by a single person, treat the set as one document." U.S. SENTENCING GUIDELINES MANUAL § 2L2.1(b)(2), cmt. n.2 (2011). At sentencing, an ICE agent testified that more than 450 digital document templates were retrieved from two thumb drives: approximately 200 United States documents and approximately 250 foreign and state identity documents. He also testified that even discounting the United States documents, the state identification and foreign documents alone exceeded 100.

Mr. Castilla-Lugo argues that evidence was insufficient because one client could have bought multiple state identification cards and foreign identification cards, which

together should count as only one document under the Sentencing Guidelines. He offers no case law to support such a reading of application note 2, and decisions in other Circuits suggest such a reading is incorrect. For example, *United States v. Badmus* involved a defendant possessing multiple false identity documents. 325 F.3d 133, 136 (2nd Cir. 2003). Some of the documents bore identical photographs with different names and biographical information. *Id.* The documents were to be submitted into various country's visa lottery programs, despite the fact that multiple entries were against the law. *Id.* Both the trial court and the Second Circuit rejected the defendant's argument that since the multiple applications were meant for use by three or four individuals, the applications constituted only three or four documents. *Id.* at 138, 140.

Likewise, in *United States v. Castellanos*, the Seventh Circuit considered whether twenty four sheets of blank counterfeit resident alien cards (each with eight impressions of the card) and two sheets of counterfeit Social Security cards (each with twelve impressions of the card) constituted a total of 216 documents, as advanced by the Government, or twenty-six documents, as advanced by the defendant. 165 F.3d 1129, 1130, 1132 (7th Cir. 1999). The Seventh Circuit noted that while a person may use both one resident alien card and one Social Security card, "[o]ne person could not use, for identification purposes, 12 Social Security cards or 8 resident alien cards found on one sheet." *Id.* at 1133. Even assuming one person could use both a resident alien card and a Social Security card, the Seventh Circuit found the Government had proven 100 documents and upheld the enhancement. *Id.*

The Ninth Circuit has also held that a sale of more than 1000 counterfeit Social Security cards and more than 1000 fraudulent Alien Registration Receipt cards constituted more than 1000 sets, despite being sold to a single person. *United States v. Perez-Gutierrez*, 234 F.3d 1279, No. 99-10208, 2000 WL 1171129, at *1 (9th Cir. Aug. 17, 2000).

The reasoning of the Second, Seventh, and Ninth Circuits is sound. Any documents that could be used at the same time for a single purpose should be considered one document. While one person could use a combination of multiple counterfeit cards

together for a single purpose (for example one Social Security card, one green card, and one driver's license), a person would not likely use for a single purpose multiple state identification or foreign identification cards. While it may be true, as Mr. Castilla-Lugo contends, that an individual would want both a state driver's license and a foreign identification card, or a series of state identification cards, to show a timeline of residency, it is speculative. Moreover, there were 250 foreign documents alone. Thus, even if a person had one state and one foreign document in a "set," there would still be over 100 documents. The district court did not err in finding that the Government proved by a preponderance of the evidence that at least 100 documents existed.

The next issue is whether all 100 documents can be attributed to Mr. Castilla-Lugo given that he was only involved in the conspiracy for six weeks before he was arrested. Mr. Castilla-Lugo argues that the enhancement only applies if 100 or more documents were produced in the offense, and he should not be held responsible for documents produced before he joined the conspiracy. He argues that to hold him responsible for documents created before he joined the conspiracy, the district court had to comply with *United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002), and make particularized findings that the creation of 100 or more documents was within the scope of his agreement to participate in the conspiracy and was foreseeable. The Government argues that Mr. Castilla-Lugo was not held accountable merely because his co-conspirators had previously produced 100 or more documents before he joined the conspiracy but rather because 100 or more documents were "involved" in Mr. Castilla-Lugo's commission of the offense.

The Government's argument is well-taken. The language of the applicable guideline provides for an increase "[i]f the offense *involved*" 100 or more documents. U.S. SENTENCING GUIDELINES MANUAL § 2L2.1(b)(2)(C) (2011) (emphasis added). Circuits that have interpreted this provision have construed the word "involved" broadly and noted that "involved" does not mean "produced." *Viera*, 149 F.3d at 8. Because a preponderance of the evidence showed that Mr. Castilla-Lugo created fraudulent documents and that the fraudulent documents were created from the digital templates,

the district court did not err in finding those templates were involved in the offense. *See United States v. Najera-Luna*, 262 F. App'x 889, 894–95 (10th Cir. 2008) (finding that existence of ninety-three virtual templates, along with documents in various stages of completion, proved that more than 100 documents were involved in the offense to warrant nine-level enhancement); *see also United States v. Singh*, 335 F.3d 1321, 1324 (11th Cir. 2003) (counting all documents "involved" in the offense in determining a § 2L2.1(b)(2) enhancement); *United States v. McDermott*, 125 F.3d 859, No. 96-10471, 1997 WL 604051, at *1 (9th Cir. Oct. 1, 1997) (holding that where a defendant displayed eleven documents for sale to an undercover officer, and subsequently transferred the five sets selected by the undercover officer for purchase, the offense involved all eleven sets); *United States v. Salazar*, 70 F.3d 351, 352 (5th Cir. 1995) (counting incomplete documents that were intended to be falsified as involved in the offense).

The *Campbell* requirements would be appropriate in an instance where the Government sought to impute, for example, the documents sold by Mr. Castilla-Lugo's co-defendants to him because those sales were reasonably foreseeable and part of the conspiracy to which Mr. Castilla-Lugo agreed to participate, but they are not applicable where Mr. Castilla-Lugo's own offense involved the use of such documents.

In conclusion, the district court did not err in finding that at least 100 documents were involved in the offense within the meaning of the guidelines and properly applied the enhancement.

**B. Substantive Reasonableness**

Last, Mr. Castilla-Lugo argues his within-guidelines sentence is substantively unreasonable. He argues first that it is not proportionate to the severity of the offense or his specific characteristics in that it overstates his role in the conspiracy. He then argues that a lesser sentence would have an equal deterrent effect.

"A sentence is substantively unreasonable if the sentencing court arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent

factor." *United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012). "In reviewing the sentence's substantive reasonableness, we consider 'the length of the sentence and the factors evaluated . . . by the district court in reaching its sentencing determination.'" *Id.* (quoting *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009). "Because '[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a),' this Court applies a great deal of deference to a district court's determination that a particular sentence is appropriate." *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 51). "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. Moreover, "[i]n evaluating the substantive aspect of a sentence, we may apply a rebuttable presumption of reasonableness to sentences within the Guidelines." *United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008).

Mr. Castilla-Lugo first argues the sentence is not proportional to the nature and circumstances of the offense and offender, as shown by the fact that it is longer than any of his co-defendants' sentences despite his limited role in the offense.[9] Even considering the differing sentences of his co-defendants, though, the district court did not abuse its discretion.

Mr. Castilla-Lugo's role, while perhaps not as extensive as Mr. Reyes-Gonzalez's, was not as limited as he argues. The evidence showed he recruited three members into the conspiracy, which doubled the conspiracy's size. He not only sold fraudulent documents himself but also utilized the vast array of digital templates and produced fraudulent documents. Further, he helped move the entire operation from one apartment to another. He did all this in the approximately six-week span that he was involved in the conspiracy.

---

[9]Mr. Castilla-Lugo does not argue that his sentence resulted in a national disparity among similar defendants but rather that the disparity among his co-defendants' sentences proves his sentence fails to consider his role in the conspiracy. As he concedes, the need to consider unwarranted sentence disparities among defendants with similar records guilty of similar conduct requires a national comparison, not a comparison of co-defendants in the same case. *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007). The district court was permitted, but not required, to consider sentence disparities with respect to the co-defendants. *Id.* at 624.

Additionally, although Mr. Reyes-Gonzalez was apparently the leader of the operation, "a district court is not required to sentence at the low end of the guidelines range simply because a co-defendant may be more culpable." *United States v. Casey*, No. 11-6147, 2012 WL 1676686, at \*2 (6th Cir. May 15, 2012). Unlike Mr. Castilla-Lugo, Mr. Reyes-Gonzalez accepted responsibility for his actions and pleaded guilty, as did Mr. Lopez-Sosa. Moreover, they both provided assistance in the Government's investigation by testifying against Mr. Castilla-Lugo, Mr. Merlos-Gonzalez, and Mr. Armendariz-Becerra. After considering their acceptance of responsibility and assistance, it is not surprising that they received lesser sentences than Mr. Castilla-Lugo despite having arguably greater culpability for the crime. *See United States v. Stewart*, 628 F.3d 246, 260 (6th Cir. 2010) (finding no abuse of discretion where district court sentenced defendant more harshly than co-defendants who pleaded guilty and cooperated with authorities). Similarly, the defendants who were tried with Mr. Castilla-Lugo were incontrovertibly involved for a much shorter period of time, were not involved in the document-production aspect of the operation, and did not recruit other members. Therefore, even though his co-defendants were sentenced more leniently, Mr. Castilla-Lugo's sentence did not overstate his role in the offense.

Further, the district court did consider both offense and offender-specific characteristics at sentencing. Although Mr. Castilla-Lugo suggests the district court did not consider the offense particularly dangerous, the court's statements at his own and each of the other defendants' sentencings show the district court considered the crimes to be "very serious felonies" implicating national security. Any reduction in sentence for the other co-defendants had nothing to do with the seriousness of the offense but rather the acceptance of responsibility, cooperation they provided, small likelihood of re-offending, or the small role those defendants played in the offense, none of which weighed in Mr. Castilla-Lugo's favor at his sentencing.

As to offender-specific characteristics, the district court noted that Mr. Castilla-Lugo had twice entered the United States illegally after being deported. Further, the district court found he was at a high risk of re-offending and that there was a great need

to protect the public from further crimes.  The district judge also viewed Mr. Castilla-Lugo's act of moving the operation from one apartment to another as an attempt to evade the law.  Therefore, the district court fashioned a sentence proportionate to both the seriousness of the offense and the offender's characteristics.

Finally, while Mr. Castilla-Lugo argues that a sentence below the guidelines range would deter this type of conduct among both himself and others similarly situated, "[a] defendant's 'mere allegation that the sentence imposed is greater than necessary to achieve the goals of punishment outlined in § 3553(a) is insufficient to rebut the presumption of reasonableness . . . .'" *Casey*, 2012 WL 1676686, at *4 (quoting *United States v. Dexta*, 470 F.3d 612, 616 (6th Cir. 2006)).

In conclusion, the district court's within-guidelines sentence was proportionate to both the offense and circumstances of the offender, and the court did not abuse its discretion in sentencing Mr. Castilla-Lugo to a longer sentence than his co-defendants.

## V. CONCLUSION

For the above reasons, the sentence is AFFIRMED.