NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0592n.06

No. 20–1102

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 19, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| MATTHEW JAMES BOEVE, | ) | |
| | ) | |
| Defendant – Appellant. | ) | |

BEFORE: MERRITT, KETHLEDGE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Matthew Boeve pleaded guilty to one count of conspiracy to distribute methamphetamine, 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A)(viii) (Count One), and one count of aiding and abetting obstruction of justice, 18 U.S.C. §§ 1503 and 2 (Count Five). The district court sentenced him to concurrent prison terms of 235 months in prison on Count One and 120 months in prison on Count Five. On appeal, Boeve seeks resentencing, arguing that the district court abused its discretion in applying a four-level leadership enhancement under the Sentencing Guidelines. We AFFIRM.

**I.**

In November 2018, Boeve was released from prison after serving a term for a probation violation. From December 2018 through February 2019, Boeve acquired methamphetamine from a supplier known as "Hype" in the Grand Rapids area and sold it locally in Holland, Michigan. In early to mid-February, Boeve learned of a source of supply in Kalamazoo, Michigan, through

Philip Bell, a co-defendant in this case. At first, Boeve went through Bell to obtain methamphetamine from the Kalamazoo source, but eventually Boeve began contacting the source directly and making trips to Kalamazoo every few days to replenish his supply.

The West Michigan Enforcement Team ("WMET") began investigating Boeve in February 2019, after multiple sources reported that he had supplied them with methamphetamine. One source, Kayde Metzler, told investigators that he had purchased a total of approximately six kilograms of methamphetamine from Boeve. Metzler's cellular phone showed that he had received four phone calls from Boeve, and a text message from Boeve's girlfriend, Danielle Malanowski, telling Metzler that he needed to pay back money he owed Boeve.

On March 25, 2019, a confidential informant contacted case agents and informed them that Boeve had requested a ride to Kalamazoo to purchase three ounces of methamphetamine. WMET officers observed Boeve travel to Kalamazoo, exit the vehicle near a residence, reenter the vehicle a short time later, and then travel back to Holland. The officers obtained search warrants for the vehicle and Boeve's person. When WMET executed the warrants, they found a plastic bag containing 67 grams of methamphetamine, another bag containing approximately 5.9 grams of methamphetamine, and a realistic looking $CO_2$-powered .177 BB gun.

In an interview conducted after he was given his Miranda rights, Boeve admitted that he had traveled to Kalamazoo to obtain two ounces of methamphetamine; he had been obtaining one to two ounces of methamphetamine every two days since the beginning of 2019; and his practice was to use a few grams of the methamphetamine himself and sell the remainder in various quantities to other dealers and users in Holland.

On April 17, 2019, Boeve participated in a proffer interview. He admitted that he began using methamphetamine in November 2018 and that by late December 2018 he began selling

methamphetamine to fund his addiction. He identified his supplier in Grand Rapids and estimated that he purchased a total of eight ounces of methamphetamine from that supplier. He also admitted purchasing methamphetamine from a Kalamazoo source whom he located through Bell.

While in the custody of the U.S. Marshal, Boeve contacted Mark Baker, a friend he had previously met in prison, and sent him documents with instructions to post the documents to Facebook for others to see. The documents underlined the names of potential grand jury witnesses who had cooperated with law enforcement in the investigation. Baker posted the documents to Facebook according to Boeve's instructions with captions that included references to "snitches" and "rats." R. 137, PID 520.

On May 21, 2019, a five-count indictment was filed naming Boeve, Bell, Metzler, and Baker as defendants. Count One charged Boeve, Bell, and Metzler with conspiracy to distribute methamphetamine. Count Two charged Metzler with possession with intent to distribute methamphetamine. Count Three charged Boeve with possession with intent to distribute methamphetamine. Count Four charged Bell with distribution of methamphetamine. And Count Five charged Boeve and Baker with obstruction of justice.

On June 6, 2019, Bell participated in a proffer interview. He stated that he believed Boeve had been controlling most of the methamphetamine supply in the Holland area prior to his arrest. He said that he sold methamphetamine for Boeve and acted as a middleman between Boeve and the source in Kalamazoo.

On June 17, 2019, Baker participated in a proffer interview. He stated that he had met Boeve in prison, and that upon his release Boeve had befriended him. Baker claimed that Boeve attempted to recruit him to sell methamphetamine and gave him a quantity of drugs to distribute, but Baker ended up selling only a small amount and then returning the remainder back to Boeve.

Baker admitted receiving documents from Boeve containing the names and identifications of cooperating witnesses and posting them on Facebook at Boeve's direction. He also admitted to confronting some of the identified individuals about their cooperation with law enforcement.

On September 3, 2019, Boeve entered a plea of guilty to Counts One and Five pursuant to a written plea agreement. The U.S. Probation Office prepared a Presentence Investigation Report ("PSR") that stated:

> Mr. Boeve is the most culpable individual in this conspiracy. Although the "conspiracy" was not organized, case materials do suggest Mr. Boeve held a leadership role in the conspiracy as he had at least three individuals selling methamphetamine on his behalf in addition to utilizing Mr. Bell as a middleman to a source of supply.

R. 137, PID 520. Utilizing Boeve's statements from his proffer interview, the PSR conservatively estimated that Boeve bought and distributed a minimum of 40 ounces of a substance containing methamphetamine. That quantity of methamphetamine yielded a base offense level of 30. The PSR recommended a four-level enhancement for Boeve's leadership role pursuant to Sentencing Guidelines § 3B1.1(a). An additional two-level enhancement was recommended for obstruction of justice. The PSR recommended a three-level deduction for acceptance of responsibility. This yielded a total offense level of 33. Boeve's criminal history established a criminal-history category of V. Based on a total offense level of 33 and a criminal history category of V, the Guidelines imprisonment range was calculated as 210 to 262 months, with a statutory mandatory-minimum term of 120 months in prison.

Boeve filed a sentencing memorandum confirming the accuracy and completeness of the PSR but objecting to the four-level leadership enhancement. The Government filed a memorandum asserting that the four-level enhancement for leadership was appropriate. The Government also argued that Boeve was not entitled to a two-level reduction for acceptance of

responsibility under the Sentencing Guidelines § 3E1.1(a), and did not move for the additional one-level reduction for acceptance of responsibility under § 3E1.1(b).

At the sentencing hearing the Government called two witnesses: co-defendant Philip Bell and Detective Adam Hill of the Ottawa County Sherriff's Department.

Bell testified that Boeve's girlfriend Malanowski introduced Bell to Boeve, and that from late-December 2018 through early February 2019, Boeve and Malanowski were Bell's source of methamphetamine. At the beginning of February 2019, Bell was introduced to a new source of methamphetamine in Kalamazoo, and he and an individual named Sean Williams began buying from that source rather than Boeve. According to Bell, Williams owed Boeve money from a previous drug deal, and Williams repaid Boeve by taking him to the new source in Kalamazoo. Bell testified that once Boeve became aware of the source in Kalamazoo, Boeve supplied most of the money for the methamphetamine, and Bell went to Kalamazoo to pick up the drugs.

The largest transaction Bell was involved in was the purchase of over seven ounces of methamphetamine from the Kalamazoo supplier. Bell testified that on this occasion, Williams had driven to Kalamazoo to purchase eight ounces of methamphetamine for himself and Boeve. Williams contacted Boeve and told him that he was approximately $200-$300 short of the purchase price. Boeve then called Bell and asked him to contact the supplier and accompany Boeve to Kalamazoo to see if they could get the drugs for only an additional $150, since that was all Boeve had. Bell did so and was able to finalize the purchase of a bit more than seven ounces of methamphetamine for a total of $1,650. According to Bell, Boeve had contributed $1,350 for the purchase and Williams had contributed $300. Williams was given one ounce of methamphetamine for his contribution; Boeve gave Bell approximately fourteen grams of the methamphetamine and

told Bell he owed $150 for that share; and Boeve kept the remainder. At a certain point, Boeve began to obtain drugs from Kalamazoo without going through Bell.

Detective Hill testified, in relevant part, that he had identified at least seven individuals who sold methamphetamine for Boeve, and that Boeve was setting the purchase price. Detective Hill also testified that in mid-February 2019, there was a gang-related murder at a Holland hotel, and that Boeve admitted during his interview and proffer that after the murder he was concerned that "the heat was on" because "the feds were in town," so he put Malanowski up in a hotel and provided her with a cell phone so that she could coordinate his drug sales and he would not lose money. R. 161, PID 711.

Based on the evidence and testimony presented at the sentencing hearing, the district court determined that a four-level enhancement for a leadership role was appropriate. Specifically, the district court found that there were "at least five or six other participants" in the conspiracy and that Boeve exerted control over at least one other individual. The district court found that Boeve had directed "Malanowski to set up in another hotel and sell his drugs" when he was worried about police activity, and that fact warranted a finding that Malanowski was a participant in the conspiracy over whom Boeve exerted control. R. 161, PID 736. The district court also found it relevant that Boeve regularly fronted drugs to other members of the conspiracy and that he was the main source of funding for the purchase of drugs from suppliers.

The district court accepted the PSR's recommended grant of a two-level reduction for acceptance of responsibility, over the objection of the Government. The district court stated that the reduction was "extremely generous" given the circumstances. R. 161, 741. Because the Government did not move for the additional one-level reduction for acceptance of responsibility, the additional reduction in the PSR was not applicable. Based on those determinations, the district

court calculated an offense level of 34 and a criminal-history level of V, which together yielded a Guidelines range of 235 to 293 months in prison. The district court found that a sentence at the low end of the advisory Guidelines range was appropriate and sentenced Boeve to concurrent prison terms of 235 months on Count One and 120 months on Count Five.

**II.**

Boeve argues that the district court abused its discretion when it applied the four-level leadership-role enhancement. Because the conclusion that a person is an organizer or leader under Section 3B1.1 of the Sentencing Guidelines "depends on a number of factual nuances that a district court is better positioned to evaluate," this court applies a deferential standard in reviewing such an enhancement. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

Boeve makes two arguments in support of his challenge. First, he argues that the leadership enhancement is inappropriate because Boeve did not exercise sufficient control or authority over any individual in the conspiracy. Second, he argues that the factors courts consider in determining whether to impose the leadership enhancement do not weigh in favor of its application here.

**A.**

Under the Sentencing Guidelines, an enhancement of four levels is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Control of all participants is not required; the enhancement is applicable if the defendant exercised control over even a single participant in the conspiracy. *See* U.S.S.G. § 3B1.1 cmt. n.2; *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012).

Here, the district court found that there were "at least five or six other participants" in the conspiracy. R. 161, PID 736. This finding is supported by Detective Hill's testimony identifying

at least seven individuals who were selling methamphetamine for Boeve. Boeve does not appear to challenge this finding.

The district court also found that Boeve exerted control over *at least* one other individual, because Boeve directed "Malanowski to set up in another hotel and sell his drugs" when he was worried about police activity in the area. *Id.* Boeve argues that his "relationship with Danielle Malanowski was insufficient to support the leadership enhancement." Appellant Br. 19. He claims that because Malanowski was his girlfriend, their relationship in the conspiracy should be considered a "partnership" in which the conduct of each was in furtherance of the partnership as a whole. *Id.* at 20. We disagree. Boeve and Malanowski's personal relationship does not negate the fact that Malanowski was selling Boeve's drugs, on his behalf, at his instruction, so that he could avoid detection by police while continuing to turn a profit. Thus, the district court did not abuse its discretion in finding that Boeve exerted control over Malanowski.

Because there was sufficient support for the district court's conclusion that Boeve exerted control over Malanowski, we need not address Boeve's additional arguments that fronting drugs to other conspirators and exercising control of the funds used to purchase drugs do not justify a leadership enhancement. Although these findings bolstered the district court's determination that Boeve acted in a leadership position, the district court's finding that Boeve exerted control over Malanowski was sufficient, on its own, to support the leadership enhancement.

**B.**

Boeve also argues that the district court did not properly weigh the factors relevant to the imposition of the leadership enhancement. Again, we disagree. In determining whether a Section 3B1.1(a) enhancement is appropriate, a court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a

> larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Hernandez*, 227 F.3d 686, 699–700 (6th Cir. 2000) (quoting U.S.S.G. § 3B1.1 cmt. n.4).

As discussed, the district court properly found that Boeve exercised authority over at least one member of the conspiracy, and there was testimony from Detective Hill that there were at least seven individuals selling methamphetamine for Boeve. Thus, Boeve's exercise of decision-making authority, the nature of his participation in the commission of the offense, and the degree of control and authority exercised over others all suggest that the enhancement was appropriate. Although the district court did not discuss Boeve's recruitment of accomplices, the PSR indicated that at least one individual stated in his proffer that he was recruited by Boeve to sell methamphetamine. There is no evidence suggesting that Boeve ever claimed a larger share of the fruits of the crimes than his co-conspirators, and Bell's testimony suggests that each co-conspirator generally recovered a quantity of drugs equivalent to his contribution of money. Thus, this factor does not support the imposition of the enhancement. Finally, although Boeve was only engaged in the conspiracy for a few months before his arrest, he appears to have become a significant supplier of methamphetamine during that period.

Thus, the majority of the factors considered under Section 3B1.1(a) weigh in favor of its application, and therefore, the district court did not abuse its discretion in imposing the leadership enhancement.

**III**.

For the foregoing reasons, we AFFIRM.