RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT L. BERTRAM, JR. (17-6527); BRYAN S. WOOD (17-6528); ROBIN G. PEAVLER (17-6542); JAMES W. BOTTOM (18-5001); BRIAN C. WALTERS (18-5002),

*Defendants-Appellants.*

> Nos. 17-6527/ 6528/ 6542/ 18-5001/ 5002

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:15-cr-00014—Gregory F. Van Tatenhove, District Judge.

Argued:  July 25, 2018

Decided and Filed:  August 20, 2018

Before:  COLE, Chief Judge; SUTTON and LARSEN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, David Oscar Markus, MARKUS/MOSS PLLC, Miami, Florida, for all Appellants.  Kate K. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:**  Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellant in 17-6528.  David Oscar Markus, MARKUS/MOSS PLLC, Miami, Florida, for Appellants in 18-5001 and 18-5002.  Mark A. Wohlander, WOHLANDER LAW OFFICE PSC, Lexington, Kentucky, Jarrod J. Beck, LAW OFFICE OF R. MICHAEL MURPHY PLLC, Lexington, Kentucky, for Appellant in 17-6527.  John S. Phillips, CLAY DANIEL WALTON & ADAMS, PLLC, Louisville, Kentucky, for Appellant in 17-6542.  Kate K. Smith, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

—————————

**OPINION**

—————————

SUTTON, Circuit Judge.  When people enter drug treatment, their doctors often order urinalysis exams to monitor their progress.  Doctors understandably prefer to get those exam results soon after ordering the tests to tailor future treatments.  The five criminal defendants in this case started a urinalysis testing company.  After they received doctors' orders to run urinalysis tests and after they received the urine samples for testing, they waited between seven and ten months to test the samples—in most instances because the testing equipment was not up and running.  The laboratory nonetheless billed the insurer the full amounts for the tests without mentioning how long ago the doctors had ordered them.  A jury convicted the defendants of seventeen counts of health care fraud.  Because a reasonable jury could find that the defendants violated the health care fraud statute by requesting reimbursement for tests that were not medically necessary, we affirm their convictions and four of their sentences.  Because the district court did not make the requisite factual finding when applying an aggravating role enhancement to one of the defendant's sentences, we vacate it and remand for resentencing.

I.

In 2010, Robert Bertram, Wes Bottom, Robin Peavler, Brian Walters, and Bryan Wood formed PremierTox, Inc., a urinalysis testing company.  All five men had ties to rural Kentucky and prior experience with substance abuse treatment or testing.  Peavler and Wood were doctors and owned a substance abuse treatment company called SelfRefind.  Bertram, also a doctor, previously worked for SelfRefind.  Bottom and Walters owned a drug testing service and a urinalysis testing laboratory.

Bringing together their combined experiences, they created a urinalysis testing company to "address the scourge of drug abuse" in the community.  Bottom & Walters Br. 3.  The idea was to run the tests ordered by physicians at drug treatment clinics, including SelfRefind.  Physicians at the clinics ordered urinalysis tests to check if their patients used illicit drugs and to monitor their medications.  According to the plan, PremierTox would receive these patients'

urine samples, perform the requested testing, and report back. All's well so far, as all of this facilitated the doctors' treatment of their patients.

But PremierTox had a rocky start. In October 2010, SelfRefind began to send frozen urine samples to PremierTox for testing, even though the company didn't have the equipment to do the job. In early 2011, soon after PremierTox bought the necessary (and expensive) urinalysis machines for this kind of testing, they broke down. Urine samples from SelfRefind piled up. PremierTox stored the frozen urine samples until the machines were running again, and eventually started testing them between February and April 2011 and finished testing them in October of that year.

Over the same period, it tested and billed for fresh samples as they came in, whether from SelfRefind or elsewhere, aiming for a forty-eight-hour turnaround. By contrast, it tested the frozen SelfRefind samples from seven months to ten months after collection. Then PremierTox sent the insurers the bill, saying nothing about the date the samples had been ordered or collected.

The government charged the defendants with ninety-nine counts of health care fraud and with a conspiracy to do the same. After a twelve-day trial, the jury acquitted them of some charges (the conspiracy charge and eighty-two of the health care fraud charges) and convicted them of others (the seventeen health care fraud charges for bills sent to Anthem Blue Cross Blue Shield for samples tested between seven and ten months after collection). The trial judge sentenced Bottom to thirteen months, Walters and Peavler to eighteen months, and Wood and Bertram to twenty-one months in prison. All five defendants appealed.

II.

A.

The five defendants first argue that the evidence was insufficient to convict them of health care fraud. The question is whether we think, after reading the evidence in favor of the verdict, that a rational jury could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Federal law makes it a crime for individuals, "in connection with the delivery of or payment for health care benefits, items, or services," to "knowingly and willfully execute[] . . . a scheme or artifice" "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises" money or property from such program. 18 U.S.C. § 1347. That means, say our cases, the government had to prove that the five defendants: (1) created "a scheme or artifice to defraud" a health care program, (2) implemented the plan, and (3) acted with "intent to defraud." *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009) (quotation omitted).

But three-part tests distract more than they inform in this case, which comes down to the meaning of "defraud" and whether the defendants satisfied it. If the defendants' requests for payment for urinalysis tests on samples from seven to ten months old amounted to fraud, it becomes much easier to conclude that they created a fraudulent health care benefits scheme, implemented it, and did so knowingly. The relevant jury instruction defined "defraud" in this way: The term covers "any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth. They include actual, direct false statements as well as half-truths and the knowing concealment of material facts." R. 280 at 21.

The key feature of this definition is the "knowing concealment of material facts." That suffices to violate the statute because omissions of material fact constitute a scheme to defraud. "To obtain something fraudulently," we have explained, "means to use misrepresentations or false promises, including statements that are known untruths, statements made with reckless disregard for their truth, half-truths, and knowing concealment of material facts." *United States v. Washington*, 715 F.3d 975, 980 n.4 (6th Cir. 2013).

To understand why, consider the mail fraud, wire fraud, and bank fraud statutes. They also prohibit "scheme[s] or artifice[s] to defraud." 18 U.S.C. §§ 1341, 1343, 1344. And they all incorporate the common law meaning of fraud as a "misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22 (1999). So too for the False Claims Act. "[F]alse or fraudulent claims" include "half-truths—representations that state the truth only so

far as it goes, while omitting critical qualifying information," all of which "can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016). More specifically, the omission of a material fact with the intent to get the victim to take an action he wouldn't otherwise have taken establishes intent to defraud under the wire fraud statute. *See United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998); *see also United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003).

Other circuits have followed this path in construing the wire fraud statute. *See, e.g.*, *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam); *United States v. Ferriero*, 866 F.3d 107, 122 (3d Cir. 2017); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009); *see also United States v. Colton*, 231 F.3d 890, 900–01 (4th Cir. 2000); *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982); *United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985).

One of our sister circuits applied this rule in resolving a nearly identical claim under the health care fraud statute. At issue were health care providers who performed medically unnecessary tests—additional urinalysis exams—and billed the insurers for them, omitting information that revealed the impropriety of the tests. The court concluded that these omissions "constitute[d] a scheme to defraud under § 1347." *United States v. Palin*, 874 F.3d 418, 425 (4th Cir. 2017).

Measured by this case law and this rule—that the omission of material facts may amount to fraud—the government presented sufficient evidence for the jury to find that the defendants defrauded Anthem. The defendants conducted urinalysis tests that they had ample reason to know were medically unnecessary and submitted the bills to Anthem, all the while omitting the date when the tests were ordered and the date when the samples were collected. It matters not that this health care provider billed for real tests performed for real patients and prescribed by real doctors. No one reasonably thought that the tests, when ordered, would be performed seven to ten months later. Hence the laboratory's choice not to reveal the extreme tardiness of the tests precluded it from relying on the doctors' certification that they were medically necessary at the time the doctors ordered them.

The timing of the tests was a material fact because Anthem wouldn't have paid for the tests had it known they weren't needed. *See Neder*, 527 U.S. at 25. The purpose of urinalysis is to give contemporaneous information about the presence of drugs in the patient's body. Sure, there could be *some* benefit to having urinalysis results ten months after collection. Doctors often appreciate having records of a patient's history. But no one—not the doctors, not the insurer, not even the defendants—thought that was why the doctors ordered these tests. Several doctors testified that the results were too old to be meaningfully used in their treatment. The insurer testified that it would never have paid for the testing had it known about the delays. And PremierTox recruited new clients with promises of two-day, not ten-month, turnarounds.

The jury also reasonably could conclude that the defendants knew the tests were not medically necessary because several witnesses testified that they told the defendants as much and because the defendants took actions—like pushing PremierTox to reach a two-day turnaround for fresh samples—that showed they knew the delayed tests weren't medically useful. The jury also heard evidence that all five defendants participated in the decision to test and bill for the frozen samples. *See United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015).

The defendants make several arguments to the contrary, but none strikes home. *First*, they argue that their claims for reimbursement were not fraudulent because they did not omit any requested information. But it makes no difference that the claim-reimbursement form offers no place to mention the delay between the date the tests were ordered and the date the tests were done. The same might be said of a fast-food restaurant. A customer placing an order doesn't ask about when he will get his hamburger; he assumes he won't be getting it a day later. So too if one orders takeout online. Just because the customer doesn't ask when his order will be ready doesn't mean the restaurant doesn't know that the customer will not be satisfied with wilted food delivered after a several-day delay. So too here. The absence of this question on the claim form is unsurprising given the thrust of the evidence in support of the verdict: Insurers do not expect urinalysis tests to be completed a half year to nearly a full year after they were ordered.

*Second*, they argue that doctors, not testing laboratories, are responsible for the medical necessity determination. Yes, yes, and no. Yes, doctors make the decision whether to order a

urinalysis test for a patient. Yes, a laboratory generally may rely on that doctor's order in submitting a claim for reimbursement as medically necessary. But no, that does not permit a laboratory to sit on a sample for seven to ten months and submit a claim for reimbursement based on the doctor's long-ago order without asking the doctor whether it is still medically necessary and without telling the insurer about the extreme delay in testing the sample.

Laboratories, it is true, may not be well equipped to determine whether a doctor orders necessary services. But that practical reality means nothing when the laboratory acts in a way that makes the services unnecessary. When laboratories know that their own actions have made a medical service unnecessary, they should not be shielded by the independent determination of a physician, who never took—who was never asked to take—the laboratory's subsequent conduct into account.

Nor can the defendants evade responsibility on the ground that the doctors never specified how quickly they wanted the tests performed and never canceled the orders. Just because the doctors didn't put expiration dates on their order forms didn't mean they were certifying they would be medically necessary until the end of time. Customary practice and common sense have a role to play. The defendants knew that the industry standard for urinalysis tests was seventy-two hours, yet they waited in some instances 100 times longer to run their tests. Under these circumstances, the defendants could not credibly claim to be following doctors' orders.

*Third*, the defendants make a series of arguments to the effect that they reasonably could have concluded that the tests were medically necessary. But considerable evidence cuts in the other direction. Several witnesses testified that they told the defendants the tests weren't necessary, and the defendants' own actions in marketing to non-SelfRefind customers showed that the defendants knew the tests weren't medically necessary. *See United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018).

The defendants insist that a provision of the Medicare Claims Processing Manual shows otherwise. The manual explains how to list the date of service on any type of medical sample that has been stored or frozen for more than thirty days before testing. Medicare Claims

Processing Manual, ch. 16, § 40.8 (Mar. 16, 2018). At best, this provision suggests only that there are some circumstances in which testing some kinds of samples after thirty days may be medically necessary. It does nothing to show that delayed urinalysis testing of that length or much longer is medically necessary or that a laboratory has no way of determining if a delay makes a test unnecessary. Because the defendants knew the tests were unnecessary and because the manual says nothing about testing seven- to ten-month-old samples, this provision does not help them.

*Fourth*, the defendants argue that they did not have the requisite intent to defraud. That they did not directly submit the relevant claims, however, makes no difference because they directed others to submit the claims. Nor do they get anywhere by maintaining that they didn't mean for the tests to be delayed. What is clear, and what matters, is that the defendants decided to test and bill for the frozen samples many months after they were collected. The defendants' argument that they lacked intent because they truly believed what they were doing was legal also fails. The jury heard ample evidence to conclude that the defendants knew the tests were medically unnecessary and that billing for them was illegal.

B.

The five defendants challenge several of the district court's evidentiary rulings. Abuse-of-discretion review applies in each instance. *Barnes v. City of Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005).

The defendants challenge the court's decision to admit evidence about the Anthem contract, namely that PremierTox should use its best efforts to provide test results within twenty-four hours of receiving a sample. But the Anthem contract provided evidence about "medical necessity" in the context of urinalysis and helped show what facts Anthem would have considered material in handling a claim. An insurer that asked laboratories to test samples within twenty-four hours reasonably could question a claim for a test conducted seven to ten months after collection.

The defendants contend that the court erred by allowing Lee Guice, the director of operations for Kentucky Medicaid, to testify for the government as an expert. Under Rule 702 of

the Federal Rules of Evidence, the district court must ensure that an expert's testimony is reliable and relevant. *See Martinez*, 588 F.3d at 323. Guice's testimony met both demands. It was reliable because she was familiar with the Medicaid regulations and she testified accurately about the meaning of the regulation defining medical necessity. And it was relevant because medical necessity cut to the heart of the case.

The defendants argue that the court should not have permitted the government to put on evidence about SelfRefind's practices on the grounds that it was prohibited prior bad acts evidence and substantially more prejudicial than probative. Because SelfRefind's practices were intrinsic to the fraud and not submitted to show propensity, Rule 404(b) of the Federal Rules of Evidence allowed their admission. *See* Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment. SelfRefind was owned by two of the defendants, and the relationship between SelfRefind and PremierTox was central to the scheme. In the absence of SelfRefind's decision to order serial tests, even after the results of older tests failed to come back on time, the plan would have failed. Evidence about the treatment of SelfRefind patients was intrinsic to the fraud because it showed how urinalysis test results were used in patient care, an issue at the core of the medical necessity question. For like reasons, the admission of the evidence did not violate Rule 403 of the Federal Rules of Evidence. As proof of the way the scheme operated, the evidence of SelfRefind's practices was highly relevant and not unduly prejudicial.

The defendants claim the district court should not have allowed evidence about the profits they made from PremierTox or their purchase of a condominium in Colorado with those profits. But evidence about PremierTox's profits went to motive. The condominium purchase, which immediately preceded PremierTox's enrollment with Anthem insurance, helped establish a motive for their bills to Anthem as well as the conspiracy charge. It makes no difference whether the defendants purchased the condominium with legitimate funds. The relevance of this evidence went beyond their generic wealth; it proved collaboration between the defendants.

C.

All five defendants challenge their sentences. We examine the district court's factual findings for clear error and its legal interpretations with fresh eyes. *United States v. Erpenbeck*, 532 F.3d 423, 433 (6th Cir. 2008).

They first claim that the court erred by imposing a four-level increase based on the loss amount. As between the intended loss of the scheme or the actual loss of it, the higher of the two controls. U.S.S.G. § 2B1.1 cmt. n.3(A). This appeal turns on intended loss, which "(I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii).

The court did not make any reversible errors in calculating the intended loss of the scheme. For offenses involving government health care programs, the total amount fraudulently billed to the program is prima facie evidence of the intended loss. *Id.* § 2B1.1 cmt. n.3(F)(viii). The record showed that the amount billed for the seventeen counts of conviction was $22,003. The district court, it is true, calculated the total billed amount as $30,600. But that figure results in the same sentencing enhancement as the correct one, making any error harmless.

Under the guidelines, defendants can rebut the presumption that intended loss is the amount billed with evidence that they never intended to receive that amount. *Id.* But the defendants claimed that they never read or understood the Anthem contract. That makes it implausible to maintain that they were subjectively aware that the contract would reimburse them only for a portion of the billed amount. The court thus permissibly found that the intended loss amount equaled the amount billed.

All of this assumes, we should point out, that this guidelines provision—dealing with "Federal Health Care Offenses Involving Government Health Care Programs"—applies here. That turns out not to be true. The provision applies to cases in which "the defendant is convicted of a Federal health care offense involving a Government health care program," *id.*, but the defendants sent these bills to a private insurer. Both parties now agree that this presumption should not have been used.

But no one raised the point below or for that matter on appeal. We raised the question at oral argument. As we see it, the misuse of this presumption did not create a plain error, and in particular did not affect the defendants' substantial rights or the fundamental fairness of the proceedings. *See Johnson v. United States*, 520 U.S. 461, 466–67 (1997). Even without the provision, the court still could have concluded that the intended loss amount was best represented by the amount billed, particularly in light of the defendants' insistence that they knew nothing about the Anthem contract and the modest requirement that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). While this provision streamlined the process, the record offers no basis for concluding that the court would have landed on a materially different amount anyway.

The defendants independently argue that the court erred by imposing a sophisticated means two-level enhancement. *Id.* § 2B1.1(b)(10)(C). The enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B). That glove fits this operation. The scheme required coordination between SelfRefind and PremierTox, in which SelfRefind ordered testing, froze the samples, and continued to send those samples to PremierTox even when they weren't being tested. The court aptly reasoned that the coordination between SelfRefind and PremierTox was at least as sophisticated as the use of shell companies and false documents that typically justifies the sophisticated means enhancement. *See United States v. Crosgrove*, 637 F.3d 646, 666 (6th Cir. 2011).

The defendants next argue that the court erred by enhancing their sentence by two levels on the ground that they abused a position of trust. U.S.S.G. § 3B1.3. Health care providers occupy a position of trust with respect to private insurance companies if they enjoy professional discretion over whether to conduct testing and submit bills. *See United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001). That discretion facilitated this scheme. It makes no difference that the relationship between PremierTox and Anthem was governed by a contract; the record supports the court's finding that Anthem's claim submission process required mutual trust.

Some of the defendants challenge the court's enhancement for their aggravating roles in the crime. U.S.S.G. § 3B1.1. We do not include Bertram and Peavler in this challenge. While they joined the briefs of their co-defendants, they made no factually based arguments about their own aggravating role enhancements. That counts as a forfeiture of the arguments. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008).

Wood challenges his four-level leadership enhancement. U.S.S.G. § 3B1.1(a). To get this increase, the individual must be the organizer of a criminal activity that involved at least five participants. *Id.* All agree that this scheme involved five or more members. At stake is whether Wood organized "one or more other participants." *Id.* § 3B1.1 cmt. n.2. A "participant" must be criminally responsible for the offense but need not have been convicted. *Id.* § 3B1.1 cmt. n.1. The record must show that the defendant had control over another criminal participant, and the court must make a finding to that effect. *United States v. Kamper*, 748 F.3d 728, 748–49 (6th Cir. 2014).

The court met each requirement. The jury heard testimony that Wood and Bertram made "most of the decisions for the group of five." R. 434 at 249. Wood also created the long-term growth plan for PremierTox and directed his co-defendants and PremierTox CEO Eric Duncan to test only reimbursable SelfRefind urine samples. We have upheld leadership enhancements on less, including on the ground that a defendant told other participants what dates to use on patient files. *United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013). No error occurred.

Walters challenges his three-level manager enhancement. U.S.S.G. § 3B1.1(b). The district court made no finding that Walters managed or supervised another criminal participant as required by *Kamper*. The court stated only that Walters' enhancement was appropriate because "everybody's making decisions in this case." R. 444 at 80. At no point, either expressly or by adopting the government's arguments, did the court find that Walters exercised control over a criminal participant. The question then becomes whether this was harmless error. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). We don't think so. On this record, it remains unclear whether anyone Walters managed or supervised was criminally responsible for the fraud.

For this reason, the district court must reexamine whether the aggravating role enhancement applies to Walters.

We affirm the defendants' convictions and all but Walters' sentence. We vacate Walters' sentence and remand to the district court solely for a redetermination of whether any aggravating role enhancement applies to him.