NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0141n.06

Case Nos. 19-4179/4180

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 17, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| DARRELL L. BRYANT; GIFTY KUSI, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | **O P I N I O N** |

**BEFORE: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Gifty Kusi and her husband, Darrell Bryant, were convicted of one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349 and four counts of health care fraud in violation of 18 U.S.C. § 1347, stemming from their submission of fraudulent Medicaid claims. Both Kusi and Bryant challenge the sufficiency of the evidence supporting two of those counts. They also argue that the district court erred in calculating the total loss amount attributable to their conduct. Individually, Kusi appeals the district court's denial of her motion to suppress evidence allegedly obtained in violation of the Public Health Service Act and Bryant appeals the district court's application of a two-level abuse-of-trust sentencing enhancement.

Finding no error in the district court's decisions, we **AFFIRM**.

## I.  Background

Kusi and Bryant were both licensed pharmacists in the greater Columbus, Ohio area.  In 2011, Kusi and Bryant opened the Health and Wellness Pharmacy (HWP) in Dublin, Ohio.  Many of HWP's patients were also patients at Clinic 5—a treatment center for opioid addiction.  HWP created "compound" pain creams and sold them to these patients.  The purpose of the creams was to relieve the physical pain that had driven them to opioids in the first place.  Compound drugs are created by assembling, preparing, and mixing one or more drugs.  Ohio Board of Pharmacy rules do not allow pharmacies to create compound drugs in bulk, but they can produce a limited quantity of compound drugs in anticipation of known prescriptions from specific patients.

Between 2013 and 2016, HWP received reimbursements of over $2 million from the Ohio Medicaid Program (OMP) related to the cream.  However, several Clinic 5 patients received the cream in the mail, or at HWP along with their Suboxone prescription, without ever requesting the cream or discussing it with a doctor.  Some patients testified that they had "no clue" why they started receiving it.  Dr. Jornel Rivera, a physician at Clinic 5, signed hundreds of blank cream prescriptions that were later filled in by Kusi and Bryant; many of the prescriptions were for patients he had never seen.

In mid-2014, Kusi and Bryant opened their own addiction treatment practice, the Health and Wellness Medical Center (HWMC).  Dr. Rivera served as the medical director.  Kusi was in charge of the day-to-day operations of HWMC, while Bryant over saw the business and its finances.  Specifically, Kusi handled the check-out process for the patients and billing.  The billing process included designating the billing code on the Medicaid claim form that corresponded to the services and products HWMC provided.

Initially, the clinic only accepted cash patients and was not very busy. Once they were approved as a Medicaid provider in 2015, however, the number of patients at the clinic increased substantially. One of the doctors at the clinic, Dr. DeMint, testified that he saw patients for about 10 to 15 minutes and felt pressure from Bryant to "see more patients faster and faster." Ten patients would often be scheduled for one 15-minute period. Patients testified that visits usually lasted anywhere from 1 to 15 minutes.

Despite these short visits, HWMC billed the majority of the office visits to Medicaid under code 99214, which corresponds to a moderately complex evaluation and management of approximately 25 minutes with the patient. A code 99214 office visit requires a physician to go through the patient's medical history, perform a physical exam, and make a diagnosis. For a period of time, services were only billed under Dr. Rivera's name because he was the only physician approved to bill Medicaid, but other doctors were the ones who provided the service. In 2015, there were 150 days where the Medicaid claims billed under Dr. Rivera included services that exceeded 24 hours for the day.

Patients often received Suboxone prescriptions without meeting with a physician. Kusi and Bryant also had their physicians pre-sign Suboxone prescriptions and place them in patient files so the patient could receive the prescription on their next visit even if they didn't see a physician. On some occasions, Bryant would enter the exam room with a patient before the physician and start evaluating the patient and filling out their chart. Bryant also filled out patient progress notes on behalf of the physicians.

As a part of their medication-assisted treatment program, HWMC offered counseling to their patients in a group setting. HWMC billed Medicaid over $1 million for counseling services and received almost $800,000 in reimbursements. Most of their counseling claims were billed

under code 90838. Code 90838 is an "add-on" code that applies when a physician is billing for an evaluation and management on the same day and they also provide counseling. The code only applies when the counseling lasts for 60 minutes. Despite billing under the 90838 code, the counseling offered at HWMC was almost always in a group setting and was not provided by a physician.

And the group counseling sessions often did not resemble counseling at all. Ohio regulations limit group counseling to 12 patients per session. However, the group sessions often contained 20 to 30 people. Patients testified that the group counseling "was not really counseling." One patient said they would just sit "with somebody from anywhere from five minutes to an hour and then, basically, le[ave]." Patients were often brought into counseling sessions after they had begun. One of HWMC's counselors asked Bryant to stop letting patients into her sessions after they started and he refused. When that counselor raised concerns about HWMC's counseling program and how there were too many patients in the group sessions, she was asked to leave.

Some of the counselors at HWMC were Chemical Dependency Counselor Assistants (CDCAs). The Ohio Chemical Dependency Professionals Board requires CDCAs be supervised by specified licensed individuals when providing counseling services. None of the CDCAs at HWMC were supervised.

In the summer of 2016, HWMC began offering art therapy. The purpose of art therapy is to use art as a tool to help patients express their feelings about traumatic experiences. At HWMC, however, art therapy consisted of several patients in a large room coloring in adult coloring books.

In July 2014, investigators at CareSource, an OMP care organization, called Agent Kevin Flaharty with the State of Ohio Board of Pharmacy expressing concerns about the compounded prescriptions HWP was dispensing. Agent Flaharty then contacted Bryant and asked him to

account for 333 prescriptions of the compounded creams. Bryant initially told Agent Flaharty that HWP received written prescriptions for all the creams they dispensed. When Flaharty asked to see the written prescriptions, however, Bryant was unable to produce them and indicated that perhaps the prescriptions had been called in instead. Bryant was able to provide the prescriptions a few weeks later, but Agent Flaharty had several concerns regarding their legitimacy. For example, while most of the claims submitted to Medicaid listed Dr. Michael Kirwin as the prescriber of the creams, none of the prescriptions Bryant provided were signed by Dr. Kirwin. Agent Flaharty and other investigators began interviewing HWP patients and discovered that many of them did not want the cream or had not even consulted with a doctor about the cream.

Agent Flaharty shared his findings with the Ohio Attorney General's Medicaid Fraud Unit, who then sought disclosure and use of certain patient records from HWP and HWMC under the Public Health Service Act, 42 U.S.C. §§ 2.64–66. In 2014, the Franklin County, Ohio Court of Common Pleas issued several orders permitting the records to be used and shared with cooperating state and federal agencies in a criminal investigation involving persons who may have committed Medicaid fraud. The orders required patient names and social security numbers to be redacted and prohibited the use of the information to prosecute any patient. The Ohio Attorney General's Office then began investigating HWMC due to their unusually high billing of moderate-complexity evaluation and management under code 99214 and the "add-on" psychotherapy code 90388.

In July 2017, a federal grand jury indicted Kusi, Bryant, and Dr. Rivera for one count of conspiracy to commit healthcare fraud and four counts of healthcare fraud. Before trial, Kusi and Bryant moved to suppress the evidence that was obtained pursuant to the orders issued by the Franklin County Court of Common Pleas, arguing, in part, they were not issued by a court of

"competent jurisdiction," as required by 42 U.S.C. § 290dd-2(b)(2)(C). The district court denied the motion and found that the Franklin County Court had jurisdiction to issue the orders.

After a two-week trial, the jury found Kusi and Bryant guilty of Count 1, conspiracy to commit healthcare fraud, and Counts 3, 4, and 5, healthcare fraud regarding Medicaid claims for compound creams that were not medically necessary or requested by the patient, for individual counseling services that were not provided, or provided in a group setting, and for counseling by unqualified individuals when there was no supervising physician. The jury acquitted as to Count 2, healthcare fraud regarding Medicaid claims for compound creams that were not medically necessary or requested by the patient. This appeal followed.

## II.    Discussion

### A. Sufficiency of the Evidence

Both Kusi and Bryant challenge the sufficiency of the evidence as to their convictions on Counts 4 and 5. They argue that the evidence introduced at trial did not prove that they acted with the requisite mental state—knowingly and intentionally causing HWMC to submit claims under the wrong billing code—and that it showed only that they negligently or recklessly billed Medicaid for HWMC's counseling services.

In assessing the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Defendants face a heavy burden in challenging the sufficiency of the evidence, *see United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008), and upon review of the record, we find that a reasonable juror would have a sufficient basis to find Kusi and Bryant guilty of counts 4 and 5.

To sustain a conviction for health care fraud, the government must prove that the defendant "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) (quoting *United States v. Agbebiyi*, 575 F. App'x 624, 634 (6th Cir. 2014)). "[B]ecause it is difficult to prove intent to defraud from direct evidence," it can be inferred from circumstantial evidence such as efforts to conceal the unlawful activity, misrepresentations, proof of knowledge, and profits. *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (quoting *United States v. Cooper*, Nos. 02–40069–01/02/03–SAC, 2004 WL 432236 at *4 (D. Kan. Feb. 10, 2004)).

The evidence introduced at trial provided ample support for the jury to make the inference that Kusi and Bryant had the requisite knowledge and fraudulent intent to commit healthcare fraud regarding Medicaid claims for individual counseling services that were not provided or provided in a group setting and for counseling by unqualified individuals when there was no proper supervising physician. The record reveals that there was no individual counseling provided at HWMC and that the mismanagement of group counseling was a systemic issue. The jury could easily infer that as co-owners of HWMC, Kusi and Bryant were not accidentally billing Medicaid for one-on-one physician counseling, especially considering that they received over $800,000 in reimbursements. Moreover, HWMC not only fraudulently billed counseling sessions to Medicaid, but physician office visits as well, providing the jury with even more evidence from which to infer that the incorrect billing was not a mistake.

Additionally, Kusi was in charge of the billing and coding process. The jury could infer that as the manager of "day-to-day" operations, Kusi was aware that the counseling sessions were

not provided by a physician and were done in a group setting, yet still intentionally billed them under code 90388.

As for Bryant, the jury could infer his intent to defraud from his role at HWMC, his misrepresentations to patients, and his efforts to conceal HWMC's unlawful activity. First, Bryant handled the overall management and the finances at HWMC. He was also heavily involved in patient-physician visits, permitting the jury to infer that he knew HWMC was billing Medicaid for physician-led counseling that did not occur. Bryant also fraudulently held himself out to be a medical doctor. Several patients testified that Bryant was the "physician" they saw at HWMC. Lastly, the jury heard evidence that Bryant was attempting to conceal HWMC's unlawful activity. A former employee testified that he and another co-worker were let go by Bryant after refusing to sign a contract that forbade HWMC employees from revealing anything about the business to the "authorities." Therefore, we find that the record reasonably supports the jury's finding of guilt as to Kusi and Bryant on counts 4 and 5.

## B. Loss Calculation

Kusi and Bryant argue that the district court erred in calculating the total amount of loss attributable to their conduct. Their argument is two-fold: the district court applied the wrong legal standard for calculating the loss, and the ultimate calculation was incorrect because it included legitimate claims reimbursable by Medicaid. We review the court's method of calculating the loss de novo and its factual findings for clear error. *United States v. Maddux*, 917 F.3d 437, 450 (6th Cir. 2019).

The Guidelines provide that amount of loss is the greater of either the intended loss or actual loss of the scheme. U.S.S.G. § 2B1.1 cmt. n.3(A). Here, the intended loss was the greater amount. Intended loss "(I) means the pecuniary harm that the defendant purposely sought to

inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii).

"For offenses involving government health care programs, the total amount fraudulently billed to the program is prima facie evidence of the intended loss." *United States v. Bertram*, 900 F.3d 743, 752 (6th Cir. 2018). Defendants can rebut this presumption by providing evidence that they never intended to receive the amount billed. *Id.* In calculating the loss, the district court "does not have to 'establish the value of the loss with precision,'" *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (quoting *United States v. Nelson*, 365 F.3d 719, 723 (6th Cir. 2004)), and need only make a "reasonable estimate." U.S.S.G. § 2B1.1 cmt. n.3(C). Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence" the court's "loss determination is entitled to appropriate deference." *Id.*; *see also United States v. Behnan*, 554 F. App'x 394, 398–99 (6th Cir. 2014).

Appellants contend that the district court "misunderstood" the legal standard from this Court's decision in *Bertram* by overlooking the word "fraudulently" in the phrase "total amount fraudulently billed" by failing to eliminate legitimately billed claims from the total loss amount. But the court correctly stated the standard numerous times during the sentencing hearing. R. 154, PageID 2628–29 ("I'm going to construe total amount fraudulently billed to the program as prima facie evidence of the intended loss."); PageID 2630 ("The total amount fraudulently billed to the program is prima facie evidence of the intended loss."). Moreover, the court specifically found that Bryant and Kusi defrauded the OMP of "$2,105,682.51 for compound creams which were found not to have been prescribed by a treating physician, were not medically necessary, and/or not provided to the patients," and "billed $1,621,445.10 for counseling services that either were not provided or not provided by a licensed provider or not provided for the amount of time and in

the manner reflected on the bill". The court did not include legitimately billed claims in its loss calculation. The court then found that Kusi and Bryant had not "effectively rebutted th[e] presumption [that the total amount fraudulently billed is the intended loss] with evidence that they never intended to receive that amount."

Appellants maintain, however, that the government "should have employed a sampling and extrapolation approach whereby a statistically valid random sample is drawn from the universe of patients or claims at issue." But "[t]here is no rule that a district court must rely upon statistical analysis in a situation such as this to determine the amount of loss pursuant to section 2B1.1." *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011). And when the government has shown that the fraud or scheme "was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate." *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019) (quoting *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)); *see also United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013) ("Indeed, it would have been justified in finding the amount of loss to be the entire $3.32 million because it found that the entire wellness program was a sham.").

Here, the government demonstrated that Kusi and Bryant engaged in a pervasive health care fraud scheme by billing millions of dollars to Medicaid for creams that were not prescribed by a physician and for counseling services that were never provided. In response, Kusi and Bryant did not meet their burden in providing "the specific value by which the loss amount should be reduced." *United States v. Reid*, 764 F.3d 528, 534 (6th Cir. 2014). At the sentencing hearing, they offered testimony of an expert witness who explained how he believed the government should have calculated the loss amount, but they did not provide the court with any specific amounts to

be excluded. Accordingly, we find that the court made a "reasonable estimate" of the amount of loss.

### C. Suppression of Evidence

Kusi challenges the district court's denial of her motion to suppress, arguing that the Franklin County Court of Common Pleas was "not competent to issue [disclosure] orders" under the Public Health Service Acts and that the government did not provide her with timely notice of the disclosure orders, pursuant to 42 C.F.R. § 2.66(b). In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Powell*, 847 F.3d 760, 767 (6th Cir. 2017).

The Act allows records to be disclosed "[i]f authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor." 42 U.S.C. § 290dd-2(b)(2)(C). Nothing in the Act indicates that a state court is not a court of competent jurisdiction, and we "may not amend or add to the plain language of a statute." *Telespectrum, Inc. v. Pub. Serv. Comm'n*, 227 F.3d 414, 421 (6th Cir. 2000). Because the language of the statute does not specify that the orders can only be authorized by a federal court, we will not read that in as a statutory requirement. The cases Kusi cites to do not compel a different result. *See United States v. Master*, 614 F.3d 236, 239 (6th Cir. 2010) (holding a warrant to be invalid when issued by a state judge who did not preside in the county where the property to be searched was located); *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001) (holding a warrant to be invalid when issued by a retired state judge lacking the legal authority necessary to issue search warrants).

Kusi's second argument, that she was not notified of the disclosure orders in a timely manner, was not raised below and is therefore reviewed only for plain error. *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). An error is plain when it is "obvious, affects

substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *Id.* The relevant regulation, 42 C.F.R. § 2.66(b) provides that a disclosure order may be "granted without notice," but that "upon implementation of an order so granted [persons holding the records] must be afforded an opportunity to seek revocation or amendment of that order." Kusi argues that notice was not given within a reasonable time, and relies on *United States v. Shinderman*, which held that "[a]s long as the delay in notice [under § 2.66(b)] does not erode a protected party's right to challenge the order . . . . it makes no difference when the opportunity to seek the revocation or narrowing of a disclosure order arises." 515 F.3d 5, 12 (1st Cir. 2008). Kusi was afforded the opportunity to challenge the order at the suppression proceedings at the district court, and she does not explain how she was prejudiced by not receiving notice sooner. *See id.* at 13. Kusi cannot show plain error here.

### D. Abuse of Trust Enhancement

Bryant appeals the district court's application of a two-level sentencing enhancement for abusing a position of trust under U.S.S.G. § 3B1.3. The PSR recommended application of the enhancement because Bryant "sexually abused a victim who used heroin" and because "he abused his position of public trust with the OMP to bill only for services which were medically necessary and rendered according to the OMP policies." The court agreed and applied the enhancement to Bryant for the sexual assault and his abuse of trust of his position as a pharmacist.

We review the district court's determination that the conduct in question constituted relevant conduct de novo. *United States v. Owen*, 940 F.3d 308, 313 (6th Cir. 2019). Bryant argues that the sexual assault cannot be considered relevant conduct under the Guidelines because it is too far removed from the healthcare offenses for which he was convicted. He also argues that the enhancement cannot be sustained based on his special skill as a pharmacist because § 3B1.3

does not apply to the use of special skills when a defendant also receives an aggravating role enhancement under § 3B1.1. Bryant received a four-level enhancement under § 3B1.1 for his role as an organizer or leader in the offense.

We need not decide whether the sexual assault constitutes relevant conduct, because the enhancement was properly applied based on Bryant's abuse of his position of public trust. Section 3B1.3 provides for a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Bryant is correct that if the enhancement is based solely on the use of a special skill, it cannot be applied in addition to an enhancement under § 3B1.1. *See* U.S.S.G. § 3B1.3. But the court's holding made clear it was applying the enhancement based on Bryant's abuse of a position of trust *and* his use of special skills. R. 154, PageID 2642 ("It's pretty patent how [Kusi and Bryant] abused their positions of trust as individuals holding special skills as pharmacists . . . because as pharmacists they created this scheme whereby individuals were provided medications that were not medically necessary and without proper consultation."); *id.* ("So they did abuse their position because they would not have been in this position to perpetrate the fraud but for their positions as pharmacists.").

And Bryant did abuse his position of trust. The Guidelines define a position of trust as one that is "characterized by professional or managerial discretion" and subjects persons holding such positions "to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. Here, Bryant held a position of trust with the OMP and abused that position by submitting fraudulent claims for services that were never performed or services that were not performed as billed. *See Bertram*, 900 F.3d at 753 ("Health care providers occupy a position of trust with respect to private insurance companies if they enjoy

professional discretion over whether to conduct testing and submit bills."); *United States v. Fata*, 650 F. App'x 260, 263 (6th Cir. 2016) ("Fata also occupied a position of trust vis-à-vis the insurers—both public and private—that he billed for fraudulent services."); *see also United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001) (same, and collecting authority from other circuits).

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgments of the district court.