NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0087n.06

Case No. 22-3323

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Feb 13, 2023<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| NICOLE WARREN, | ) | THE NORTHERN DISTRICT OF |
|  | ) | OHIO |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

Before: MOORE, STRANCH, and MURPHY, Circuit Judges.

MURPHY, J., delivered the opinion of the court in which STRANCH, J., joined. MOORE, J. (pp. 12–13), delivered a separate dissenting opinion.

MURPHY, Circuit Judge. Nicole Warren agrees that she participated in an extensive fraud scheme that cost her victims over $200,000. But she disagrees that she qualified as an "organizer" or "leader" of this scheme for purposes of an aggravating-role enhancement in the Sentencing Guidelines. U.S.S.G. § 3B1.1(a). Yet the facts contained in her plea agreement and her coconspirators' statements to law enforcement gave the district court a fair basis to conclude that she played a leadership role. Given the deference that we owe its finding that she qualified for this enhancement, we affirm.

I

The following facts come from Warren's plea agreement or from portions of her presentence report to which she did not object. *See* Fed. R. Crim. P. 32(i)(3)(A); *United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009).

Between September 2018 and April 2020, Warren engaged in a fraud scheme with eight others that resulted in at least $220,716.54 in losses. Throughout this time, the scheme followed a common pattern primarily in northeast Ohio and western New York.

The conspirators would steal people's personal identifying information and make fake IDs that combined their victims' information with their own pictures. They would use these fake IDs to open fraudulent bank accounts at several banks, including Fifth Third Bank, Huntington Bank, and U.S. Bank.

The conspirators would next search for legitimate checks by stealing mail from the mailboxes at residential and commercial locations. They would change the payees on these stolen checks to match themselves or the individuals whose identities they had stolen. The conspirators would alternatively create their own fraudulent checks using sophisticated printing equipment and make the checks payable to these individuals. They would then deposit the illegitimate checks in the fraudulent bank accounts or cash the checks at the banks. If they deposited the checks, they would later withdraw the money from the accounts and use it for their own benefit. The conspirators would also sometimes cash the illegitimate checks at other retail establishments, such as liquor or drug stores.

Separately, the conspirators would use the victims' stolen personal identifying information to obtain credit accounts from banks, retailers, or online-payment systems. They would rely on these fraudulent credit lines to buy goods and services at many venues, ranging from the Hard Rock Casino to Kohl's.

Warren played a large part in the fraud. Her coconspirators identified her as the primary person who stole mail in search of checks. They also identified her as the one who made the counterfeit checks and fake IDs. Warren would sometimes cash or deposit these checks herself. Other times, she would give the counterfeit checks and fake IDs to coconspirators and drive them to the chosen bank, so that these coconspirators could cash or deposit the checks. In return, the coconspirators would give her a cut of the proceeds: "At various times, co-conspirators delivered money obtained from cashed checks to" her. Plea Agreement, R.28, PageID 146.

The scheme came crashing down in April 2020. Warren attempted (but failed) to cash a check for over $800 at a bank in rural southeast Ohio. Local authorities tracked her down, but she gave them a false identification. They eventually learned her true identity and found stolen mail and fraudulent checks in her car. A subsequent search of her home uncovered checks, computers, printers, and personal identifying information for 162 people.

Warren entered into a plea agreement. She pleaded guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344; two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); two counts of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit access-device fraud, in violation of 18 U.S.C. § 1029(b)(2); one count of mail theft, in violation of 18 U.S.C. § 1708; and one count of access-device fraud, in violation of 18 U.S.C. § 1029(a)(2).

Warren and the government agreed on several calculations under the Sentencing Guidelines. But they disagreed over whether Warren qualified as an "organizer" or "leader" of the fraud scheme—a fact that would increase her offense level by four under the aggravating-role enhancement in U.S.S.G. § 3B1.1(a).

Warren's presentence report recommended that the district court apply this enhancement. In interviews with Warren's coconspirators, the report reasoned, the coconspirators had identified Warren as the person who "made fraudulent checks" and "fraudulent identification[s]" and who "stole mail from various locations." PSR, R.50, PageID 344. According to the coconspirators, Warren also gave them the fraudulent checks that they cashed or deposited at banks using the fake IDs that she had provided. The report lastly mentioned the incriminating evidence found at Warren's home.

Warren objected to the report's recommendation. As evidence that she had not acted as an organizer or leader, she offered four law-enforcement summaries of interviews with coconspirators. She also provided a declaration from a friend who had lived at her house for three months and who implicated another coconspirator as the ringleader.

At sentencing, the parties continued to debate whether the enhancement applied. According to the government, § 3B1.1(a) required Warren to have led or organized only one other participant, and the court could find that she had done so based on the statements from her coconspirators alone. The court agreed. It pointed out that, "as the government has highlighted and outlined," Warren gave her coconspirators the counterfeit checks and fake IDs to use. Sent. Tr., R.62, PageID 458. It also referred to her role in printing the checks and noted that she possessed the equipment required to do so. It lastly suggested that her "history of forgery"

4

supported a finding that she led the operation. *Id.*, PageID 459. Ultimately, the court imposed a total of 94 months' imprisonment for all eight counts.

II

Section 3B1.1 requires district courts to increase the offense level of defendants who have "aggravating roles" in the crime. As relevant here, this guideline provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a). This language contains two primary elements. A defendant must qualify as either an "organizer" or a "leader" of the "criminal activity." *Id.* And the "criminal activity" must either "involve[] five or more participants" or be "otherwise extensive." *Id.* Warren does not dispute the second element, so we need only focus on whether she qualified as an organizer or leader of the fraud scheme.

The guideline does not define these words, but their usual meanings are obvious enough. An organizer is "one who 'organizes'" (that is, who "arranges") the criminal activity, whereas a "leader" is "one who takes the lead in" (that is, who "guides others" in) the activity. 10 *Oxford English Dictionary* 924 (2d ed. 1989); 13 *Oxford English Dictionary*, *supra*, at 747. A review of the guideline as a whole provides context for what it requires. Section 3B1.1 elsewhere instructs district courts to increase a defendant's offense level by three if the defendant qualifies as a "manager or supervisor" (rather than an "organizer or leader") of the criminal activity. *Id.* § 3B1.1(b). Thus, an organizer or leader (who receives a 4-level enhancement) necessarily must have a larger criminal role than a mere manager or supervisor (who receives only a 3-level enhancement).

The guideline's commentary (which both parties accept) offers further clarification. *Cf. United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021). One application note provides that

a defendant cannot qualify as an organizer or leader merely because the defendant manages the "property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1 cmt. 2. Rather, the defendant must lead or organize "one or more other participants" in the crime. *Id.* Our caselaw has thus "repeatedly" held that § 3B1.1 requires the defendant to have overseen a *participant* (not just a *scheme*). *United States v. Davis*, 815 F. App'x 908, 911 (6th Cir. 2020) (citing cases). We have also reversed a district court's use of this enhancement when it misunderstood the law by relying on the defendant's management of the criminal activity alone. *See United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014); *see also United States v. Bertram*, 900 F.3d 743, 753–54 (6th Cir. 2018). At the same time, we have held that § 3B1.1 requires a defendant to have led or organized only one other participant in the scheme. *See Baker*, 559 F.3d at 449.

A separate application note identifies "[f]actors" to help courts distinguish the more significant organizer or leader from a "mere" manager or supervisor. U.S.S.G. § 3B1.1 cmt. 4. These factors direct a court to ask both general and specific questions. Generally, what was "the nature and scope of the illegal activity" and the "nature" of the defendant's "participation" in it? *Id.* Specifically, did the defendant "exercise" "decision making authority" over the scheme? *Id.* And did the defendant have a high "degree of participation in planning or organizing" it or a high "degree of control and authority" "over others"? *Id.* Lastly, did the defendant "recruit[]" "accomplices" or assert a "right to a larger share of the fruits of the crime"? *Id.* Because these factors offer only useful guideposts, a court need not find them all met to apply the enhancement. *See United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012). We have, for example, upheld the use of the enhancement based largely on a defendant's recruitment of others. *See id.* at 461 (citing cases).

These factors demonstrate the fact-intensive nature of this aggravated-role inquiry—something that matters to our standard of review. We, of course, review the factual findings supporting a district court's aggravating-role conclusion under the clear-error standard. *United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018). We must uphold a factual finding so long as the record permitted the district court plausibly to reach it, even if conflicting evidence reasonably could have justified the opposite finding. *United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021). Aside from the facts, though, how should we review the district court's ultimate conclusion that the enhancement does (or does not) apply on a given record? At times, we have described this type of ruling as a "legal conclusion," *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013), but the Supreme Court's more recent guidance might treat it as a "mixed question[] of law and fact[.]" *United States v. Thomas*, 933 F.3d 605, 609 (6th Cir. 2019) (citing *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966–67 (2018)). Either way, we have repeatedly held that we must review the district court's final aggravating-role conclusion under a "deferential" standard given its fact-intensive nature. *Washington*, 715 F.3d at 983; *see Davis*, 815 F. App'x at 915; *Sexton*, 894 F.3d at 794.

This deferential standard of review compels us to uphold the district court's conclusion that Warren qualified as an organizer or leader under § 3B1.1(a). The relevant factors reasonably justified that conclusion. To begin with, the "nature and scope" of the fraud scheme was extensive, as was Warren's "participation" in it. U.S.S.G. § 3B1.1 cmt. 4. In her plea agreement, she admitted that the scheme lasted for over a year and a half and caused over $220,000 in losses. She also played the main role, as evidenced by one coconspirator's description of the enterprise as "Warren's fraud ring" in an interview. Int. Summ., R.49-1, PageID 310. Confirming this point, Warren did not dispute the finding in her presentence report that she caused substantially more

7

loss (the entire amount) than the coconspirator who caused the second most amount of loss (only $17,540).

Warren next had a "high degree of participation" in "the planning and organization" of the scheme and in leading other participants in its execution. *United States v. Arrechavaleta*, 851 F. App'x 570, 573 (6th Cir. 2021); U.S.S.G. § 3B1.1 cmts. 2, 4. Coconspirators told investigators that Warren was the one who stole mail and made fraudulent checks and fake IDs. PSR, R.50, PageID 344. These statements were corroborated by the evidence discovered at Warren's home, including the computers and printers and the personal identifying information of some 162 people. Warren also "instructed" others in executing the scheme. *United States v. Nicolescu*, 17 F.4th 706, 725 (6th Cir. 2021). Coconspirators told investigators that they "cashed counterfeit checks given to [them] by" Warren, using forged identification also "given to [them] by Warren." Int. Summ., R.49-1, PageID 313; *id.*, PageID 316–17; PSR, R.50, PageID 344. Warren even "transported" them to the chosen banks "to open bank accounts, deposit checks, and cash checks." Plea Agreement, R.28, PageID 145; PSR, R.50, PageID 331.

The other factors likewise reasonably supported the enhancement. As for Warren's "recruitment of accomplices," U.S.S.G. § 3B1.1 cmt. 4, one coconspirator noted that Warren "was always looking for people to cash the counterfeit checks." Int. Summ., R.49-1, PageID 314; *see Castilla-Lugo*, 699 F.3d at 461. Warren also expected to receive a substantial share of the profits. U.S.S.G. § 3B1.1 cmt. 4. When coconspirators successfully cashed checks, they "provided portions of the money they obtained" to her. PSR, R.50, PageID 331. As one example, a coconspirator who successfully cashed a check received only $60 and some drugs, while Warren obtained the remaining "$900.00 something." Int. Summ., R.49-1, PageID 309. As another

example, a coconspirator once refused to share the profits from a cashed check, and Warren "got mad," "robbed her," and "took her money and some clothes." *Id.*, PageID 314.

All told, the record in this case gave the district court a sufficient basis to find that the enhancement applied. Indeed, we have previously upheld the use of this enhancement for similar check-cashing frauds in which a defendant (like Warren) "provided the counterfeit checks and identification, and shared in the proceeds." *United States v. Green*, 242 F. App'x 343, 347 (6th Cir. 2007); *see United States v. Burley*, 241 F. App'x 290, 296–97 (6th Cir. 2007).

In response, Warren criticizes the district court's reliance on her prior frauds as a basis to find that she held a leadership position in the current fraud scheme. Yet her criminal history showed that she had "knowledge of the proper steps to set up and carry out the" scheme. *Arrechavaleta*, 851 F. App'x at 573. The court thus could reasonably rely on this history (as one among several other factors) to show that Warren held an organizational or leadership position in it. *Id.*; *see Burley*, 241 F. App'x at 296–97.

Warren next criticizes the district court for failing to make specific factual findings for each of the several factors listed in § 3B1.1's commentary. Yet the district court recognized those "factors" at the outset of its analysis, so nothing suggests that it misunderstood the law. Sent. Tr., R.62, PageID 458. The government had also already described the statements of Warren's coconspirators as the basis for finding most of the factors satisfied. While more factual specificity would have been helpful, based on our deferential standard of review, we do not find error in the court's decision to reference in summary what the government had already "highlighted and outlined[.]" Sent. Tr., R.62, PageID 458; *see United States v. House*, 872 F.3d 748, 751–52 (6th Cir. 2017); *cf. Bertram*, 900 F.3d at 754.

Warren also argues that the district court wrongly applied the enhancement because it found that she merely managed the *property* and not any of the *participants*. To the contrary, the government pointed to the commentary that required a defendant to supervise at least one "participant," not just the criminal activity. Sent. Tr., R.62, PageID 456. So again, nothing suggests that the court misunderstood the law. *Cf. Kamper*, 748 F.3d at 748. The court's finding that Warren gave the "counterfeit checks" and fake IDs to coconspirators so that they could cash the checks also shows her leadership over these participants. Sent. Tr., R.62, PageID 459. In fact, coconspirators regularly described their criminal activities as "for" Warren. *See Green*, 242 F. App'x at 347. One noted that he had recruited others "to cash fraudulent checks for Warren." R.49-1, PageID 309. Another likewise described "cash[ing]" a check "for Nicole." *Id.*, PageID 317.

For these reasons, Warren wrongly analogizes her case to *United States v. Christian*, 804 F.3d 819 (6th Cir. 2015). There, the defendant participated in a scheme to steal semitrucks, including one truck with a load of tires. *Id.* at 821. We held the district court erred in applying an aggravating-role enhancement based on the defendant's "control" of the stolen tires because the court "stated that other people were in charge" and "did not state that [the defendant] controlled a co-participant." *Id.* at 824. Here by contrast, the district court did not rely on the mere fact that Warren controlled the equipment. It added that she gave the counterfeit checks to the coconspirators to cash, showing her oversight of participants, not just property.

Warren lastly points to the declaration from her friend that suggested that another coconspirator had been "running the operation." Decl., R.49-2, PageID 319. There are both legal and factual problems with this argument. Legally, there can be "more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt.

10

4; *see Washington*, 715 F.3d at 984.  Factually, the record as a whole gave the district court a fair basis to apply the enhancement despite the declaration.  Among other evidence, another person implicated in the scheme described this coconspirator (the one allegedly running the operation) as "'high up' in *Warren's* fraud ring"—suggesting that she too was working at Warren's direction. Int. Summ., R.49-1, PageID 310 (emphasis added).

We affirm.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority makes a reasonable case for the application of the aggravated-role enhancement. I respectfully dissent, however, because the majority makes its case using factual findings that the district court failed to make in the first instance. I would not backfill what the district court left incomplete.

We review a district court's determination that a defendant was an organizer or leader "deferentially, and its factual findings for clear error." *United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018) (quoting *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017)). Implicit in this deferential standard of review is the requirement that the district court make and articulate its factual findings. If the lower court fails to provide a reasoned and adequate basis for its application of the enhancement, both the parties and the reviewing court are left to guess whether one fact or another led the court to its decision. Our cases preclude that form of post-hoc factfinding.

In *United States v. Kamper*, we addressed a challenge to the district court's application of the aggravated-role enhancement. 748 F.3d 728, 748–49 (6th Cir. 2014). The record "arguably demonstrate[d]" that the defendant "was responsible for directing other individuals in menial tasks[.]" *Id.* at 748. And the district court found that the defendant shared "control of the *criminal enterprise*" with others. *Id.* Yet we held that the district court erred in imposing the enhancement "because it failed to make a factual finding that [the defendant] managed or supervised other individuals involved in the conspiracy." *Id.* We explained that "regardless of whether [the defendant] actually did supervise other individuals in the conspiracy, the district court erred procedurally by misapprehending the law and applying the aggravating-role enhancement based solely upon [the defendant's] management of the criminal activity." *Id.* at 748–49.

We later distilled *Kamper*'s holding into a basic rule: Before a district court may apply an aggravated-role enhancement, "[t]he record must show that the defendant had control over another

12

criminal participant, *and the court must make a finding to that effect*." *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018) (emphasis added) (citing *Kamper*, 748 F.3d at 748–49).

Here, the district court did not make a finding that Warren "had control over another criminal participant." *Id*. The district court's discussion of Warren's role in the charged fraud scheme was cursory. R. 62 (Sent'g Tr. at 14–15) (Page ID #458–59). The court noted that Warren "coordinated with coconspirators," "printed the checks," "possessed" certain devices, "gave coconspirators counterfeit checks" and other fraudulent documents, and "has a history of forgery." *Id*. At most, these findings suggest that Warren "direct[ed] other individuals in menial tasks" or "shared control of the *criminal enterprise*." *Kamper*, 748 F.3d at 748. None amounts to a finding that Warren had control over another coconspirator.

The district court also referenced the presentence report and the government's sentencing presentation. R. 62 (Sent'g Tr. at 14) (Page ID #458). To the extent that the court can be said to have adopted either the report or the presentation, neither supplies the critical but missing factual finding that Warren had control over another criminal participant. *See* R. 50 (PSR at 20–21, 23) (Page ID #344–45, 347); R. 62 (Sent'g Tr. at 11–14) (Page ID #455–58). Both the presentence report and the government's sentencing presentation mirror the district court's focus on Warren's control over the *means* of the fraud scheme rather than the *participants* in it. *Id.*

Accordingly, even if the majority is correct that there is evidence in the record that Warren had control over another criminal participant, the district court failed to make a finding to that effect. I decline to join the majority in supplying that missing finding, and would vacate Warren's sentence and remand the case for appropriate factfinding and resentencing.

I respectfully dissent.